Doris Marie ALLEN, etc., et al.

v.

The SCHOOL BOARD OF the CITY OF
CHARLOTTESVILLE, VIRGINIA,
et al.

Civ. A. No. 51.

United States District Court
W. D. Virginia,
at Charlottesville.

Dec. 18, 1961.

S. W. Tucker, Richmond, Va., Otto L. Tucker, Alexandria, Va., for plaintiffs.

John S. Battle, Jr., Richmond, Va., for defendants.

PAUL, District Judge.

This is another step in the litigation involving the desegregation of the public schools of the city of Charlottesville. In February, 1959, the School Board of the City submitted a plan of desegregation of the schools which was approved by the court and as to the terms of which there was no controversy.

By an order of July 26, 1960, certain additional persons were allowed to intervene as plaintiffs and to file their complaint and motion for further relief, in which they alleged that the defendant School Board was not complying with the plan of desegregation previously submitted and approved but was continuing a policy of discrimination in the assignment of pupils to the schools, and praying that the court re-examine and modify the plan of desegregation previously approved. After a hearing on the complaint of the intervening plaintiffs, the court in an order of August 15, 1960, accompanied by an opinion filed on the same date, denied the prayer of the intervenors' complaint to modify the previously adopted plan of desegregation and approved the action of the defendants in denying the plaintiffs admission to schools to which the plaintiffs had sought entrance.

From the order of August 15, 1960, the plaintiffs appealed and the action of the Court of Appeals is set forth in its opinion rendered on April 14, 1961, under the style of Dodson v. School Board of City of Charlottesville, reported in 4 Cir., 289 F.2d 439. It will be seen from this opinion that the appellate court criticised the manner in which the plan of desegregation was being administered and pointed out its inequities. It refrained, however, from reversing this court's order of August 15, 1960, but did so only after expressing its confidence that the discriminatory practices which it pointed out would be promptly remedied by the school authorities of the city of Charlottesville.

This case having been retained on the docket for any action that might be necessary in the future, the plaintiffs, together with others who were allowed to intervene as such, have filed a motion for further relief in which they complain that, in the assignment of pupils to the public schools in Charlottesville, the school authorities continue practices which discriminate against Negroes, including those which the Court of Appeals condemned. The extent of the relief sought by the present motion appears to go somewhat beyond any which has been previously in issue, but it is believed that all the questions now raised can be determined within the purview of the opinion of the Court of Appeals in Dodson v. School Board heretofore referred to.

The opinion of the Court of Appeals in this case recites clearly the practices which it considered discriminatory and the respects in which correction was called for, so that it is unnecessary to repeat them here. Following the rendition of the opinion by the Court of Appeals, and prior to the opening of the present school term, the school authorities made certain changes in the method of assignment of pupils to the several schools in an effort to meet the objections raised by the Court. It remains to be seen whether they have succeeded in doing so.

For clarity it may be again noted that for purposes of school attendance the City is divided into six geographical districts, each of which contains an elementary school. These schools are known as Burley-Moran, Clark, Johnson, McGuffey, Venable and Jefferson. The first five mentioned are schools which may be called "white" schools, i. e. where the attendance is composed wholly or predominantly of white children. Jefferson is the Negro school attended solely by children of that race. Merely for convenience these geographical divisions and schools will hereinafter at times be referred to as "white districts" or "white schools" and "Negro district" or "Negro school." It may be said that there are no geographical districts so far as high school attendance is concerned.

Coming now to the plan of assignment of pupils to the several schools, the plan as affects the elementary schools may first be considered for it is there that the most important question arises and the one most difficult of solution. Under the plan adopted with the beginning of the current school term and now in operation every child, regardless of race, is initially assigned to the school in the district in which he or she resides. This assignment is subject to the condition that if the school in the district where the pupil lives and to which it is assigned is one attended wholly or predominantly by children of the opposite race its parents may apply for a transfer to a school in another district where the attendance is predominantly of its own race. The following quotation from defendants' brief sets forth the method of assignment now in force.

"The change in the procedure for the current session was designed to enroll initially and automatically all pupils in the elementary schools serving the districts of their residences, no matter whether they were white pupils in Jefferson district or Negro pupils in some other school district; but relying upon the principle that no pupil should be compelled to attend against his will a

school occupied entirely or predominantly by pupils of the opposite race, the Superintendent granted all requested transfers of the white pupils in Jefferson district and granted all requested transfers of Negro pupils residing in the other districts. The white children so involved were allowed to transfer to some school other than Jefferson and the Negro children so involved were allowed to transfer to Jefferson School. There were approximately One Hundred Forty (140) white pupils living in the Jefferson district who applied for such transfers and they were assigned in the current session to McGuffey, Johnson and Venable Schools, depending upon factors considered important by the Superintendent. Although it is not in the record, the writer is advised that there were approximately fifty (50) Negro elementary school pupils residing in the remaining five elementary school districts who sought and were granted transfers to Jefferson School."

In other words, and more briefly stated, those white children living in Jefferson district where the only school is a Negro school are assigned to that school, but if they so desire they may apply for a transfer to white schools in one of the other districts. Similarly Negro pupils living in one of the districts where the school is a white school are assigned to that school, but if they so desire may apply for transfer to the Negro school in Jefferson district. As stated in defendants' brief, above quoted, this course proceeds on the principle that no pupil either white or Negro should be compelled, against his will, to attend a school occupied wholly or predominantly by members of the opposite race, but should be allowed, if he prefers, to attend a school where his associates are of his own race.

It is obvious that this procedure falls far short of any complete or enforced integration of the school system. In fact it contemplates that there should be no compulsory integration. Nevertheless this court feels that it is permissible and is not discriminatory. The charges of discrimination are centered on the situation in Jefferson district where the white children resident there are permitted to transfer to schools in other districts, whereas Negro children resident in Jefferson are not allowed to transfer to other districts. But a similar condition, in converse, obtains in the other five districts where resident Negro children are permitted to transfer to Jefferson while white children are restricted to the district where they reside. Attention centers on Jefferson district because of the accident of residence and school location. It is in Jefferson that the large majority of the Negro school population lives and it is there that is located the school heretofore designated for Negro children. In insisting that Negroes resident in Jefferson district attend Jefferson school the authorities are merely following the principle of requiring pupils to attend the school within their area of residence. They apply the same restrictions upon white children in the other areas. And any departure from this policy in the cases of white children living in Jefferson and Negroes living outside of Jefferson is based on the desire to avoid compelling children of either race to attend school with members of the opposite race if they wish not to do so.

One alternative to this policy would be the assignment of all pupils solely on the basis of residence with no transfers permitted, resulting in enforced integration of all schools. It is not believed that the law requires this nor, apparently, is it at present desired by a majority of either race. Another alternative would be to allow pupils of both races to attend any school they might choose anywhere in the city. The result of this would be chaotic with some schools practically deserted and others crowded far beyond capacity. Taking all factors into consideration the present plan of assignment tends to an orderly administration of the school system and, in my opinion, cannot be said

to discriminate against the Negro children. This view is based on the assumption that the plan will be carried out in good faith and its terms adhered to in practice without the introduction of other conditions which may be used in a discriminatory manner.

It must be said that there is some indication of inconsistency in carrying out the plan of assignment. There is shown the instance where a Negro child resident in Jefferson district was assigned to Venable school. The reason given by the Superintendent of Schools is that the child was of exceptional intelligence and it was thought that she would profit by attending Venable. However, this action did not conform to the promulgated plan of assignment and forces the surmise that it was taken to afford a denial of unfair discrimination against Negroes. But it points to a questionable factor in the administration of the assignment plan and to a means whereby it may be used in a discriminatory manner; namely, in the right of the Superintendent to exercise his judgment as to whether attendance at a particular school is to the best interest of the child and to make assignments or to make or deny transfers in accordance with such opinion. The free exercise of such a right can be used to make discriminatory any plan no matter how fair upon its face.

It seems necessary, therefore, to eliminate from the plan of assignment all factors except that of residence, and to base the granting of transfers solely on the desire of pupils to attend a school with members of their own race. I am well aware that academic attainment and scholastic aptitude have been deemed by many courts as proper for consideration in the determining what school a child should be assigned to. But when they are used to discriminate between the races they cannot be allowed. I think it evident that their use has effected discrimination in Charlottesville whether it was so intended or not. This will be apparent when we come to consider high school attendance.

In the area of high school attendance it is plain that the practices in force cannot be approved in the light of the Court of Appeals opinion in Dodson v. School Board. So far as appears no significant change has been made in the practices there condemned. The two high schools in the city are Lane, the school for white pupils, and Burley, the school for Negroes. No areas of residence have been fixed for attendance at these schools, and before this litigation began all white pupils in the city went to Lane and all Negroes to Burley. As a result of court action in recent years some Negroes have been admitted to Lane while all white students continue to go there. However in determining attendance at Lane different rules are applied as between white and Negro children. Any white child who finishes elementary school may enter Lane High School automatically—i. e. without being subject to any test or condition as to residence or academic qualification. On the other hand, in order to attend Lane, Negroes must live closer to that school than to Burley and must also satisfy certain tests touching their scholastic advancement and intelligence. These practices, as the Court of Appeals has emphasized, are plainly discriminatory. For example, four of the plaintiffs here were denied admission to Lane because their records in elementary school showed them to be backward or lacking in studiousness and, in the opinion of the Superintendent, their academic deficiencies were such that they could not have assimilated the courses of instruction at Lane and would have fallen behind other students there. There may have been justification for his belief but no such criteria were applied to white pupils entering Lane. Similarly several other Negroes were denied admission to Lane because they lived closer to Burley, a test which also is not applied to white pupils.

Here again we run into the discrimination which may be, and is, practiced by applying the tests of academic attainments and aptitudes as a reason for barring Negroes from entrance to previously white schools. These criteria are all

the more open to question because they are indefinite. In reality they merely represent the belief of the Superintendent of Schools that the Negro child would not do satisfactory work if allowed to enroll in the white school. And this calls to attention another condition which seems in large measure to be responsible for the reluctance to assign Negroes to Lane when their academic qualifications are not of high standard, namely, the difference in the courses of study at the two high schools. The curriculum at Lane is about the same as the average white high school, designed to prepare students to enter the standard college and pursue their education there. At Burley more attention is given to manual training and studies aimed to furnish the student a means of livelihood at some manual or domestic employment upon finishing high school. Some of the college preparatory courses given at Lane are absent from Burley. Speaking of this the Superintendent of Schools said that Burley "can take better care of children whose competences don't lie in the academic realm." This condition lends encouragement to the practice which the school authorities have exercised of considering the academic record and prospects of pupils in assigning them to one school or the other. Negroes displaying good records and high intelligence may be, and some have been, assigned to Lane. But those of less promise are sent to Burley. This right to assign the Negro pupils in accord with the judgment of the Superintendent of Schools is one earnestly insisted on by him, as evidenced by this excerpt from his testimony:

"If you are operating an educational institution, whose purpose is to educate children, and if you don't have the power to assign children in accordance with their educational best interests, I don't see how you can operate the school system, except at the whim and fancy of the most irresponsible elements in the community."

Without passing on the merit of the quoted statement, it need only to be said that the power of assignment if granted must be exercised without discrimination and the factors on which it is based must apply alike to both races, which has not been done in the assignment of pupils to the Charlottesville high schools.

In summary, therefore, I am of opinion that the present rules governing assignments to *elementary* schools are not unlawful and are free of the faults which the Court of Appeals noted. This finding, however, is based on the assumption that the plan now in effect will be strictly carried out and that no criteria of intelligence, academic qualifications, or similar or related tests of any sort will be applied to Negro children unless and until a general plan formulating such criteria is adopted for application to all pupils in the elementary schools of the city.

As to the high schools it is plain that there must be an abandonment of the practice of submitting Negroes to the criteria of residence and of scholastic aptitude or related tests, so long as similar tests are not applied to white children. At present white pupils are allowed to attend Lane High School without regard to where they live in the city and without regard to their scholastic attainments or prospects. The same privilege must be accorded to Negro students. There will, of course, be a like unrestricted right available to both races to attend Burley High School. This in effect means that as matters now stand attendance at the high schools in Charlottesville is to be based solely on the student's decision as to which school he prefers to attend.

I am aware that the elimination of all criteria as to academic aptitude and similar tests in the assignment of pupils in both the elementary and high schools and the giving of freedom of choice in high school attendance will be objectionable to the school authorities and will be met with the charge that it is disruptive of an orderly and efficient administration of the school system. It may create some

problems, but if so it can only be said that the original source of these troubles lies in the discriminatory practice heretofore existing.

I have carefully considered what was said by the Court of Appeals in its opinion in Dodson v. School Board and have carefully considered the steps to be taken to satisfy the criticisms there made. And while the requirements which I have herein set out nullify some standards for assignment of pupils which have elsewhere been approved, I can see no other way, under the facts of the present cas, whereby the mandate of the Court of Appeals can be carried out. It may be at some future time that the school authorities of Charlottesville can arrive at a plan for pupil assignment which permits greater latitude in the assignment of individual students; but it goes without saying that when such a plan is devised it must apply impartially to children of both races.