Cecelia JACKSON, an infant, etc., et al.

v.

The SCHOOL BOARD OF the CITY OF LYNCHBURG, VIRGINIA, et al.

Civ. A. No. 534.

United States District Court
W. D. Virginia,
Lynchburg Division.
Jan. 15, 1962.

Reuben E. Lawson, Roanoke, Va., James M. Nabrit, III, New York City, for plaintiffs.

S. Bolling Hobbs, of Caskie, Frost, Davidson & Watts, Lynchburg, Va., C. Shepherd Nowlin, City Atty., Lynchburg, Va., A. B. Scott, Peyton, Beverley, Scott & Randolph, Richmond, Va., for Pupil Placement Board.

MICHIE, District Judge.

This is a suit brought by four colored children, by their next friends, and also by the parents, guardians or persons standing in loco parentis of the infant plaintiffs against the School Board of the City of Lynchburg, Virginia, M. C. Carper, Superintendent of Schools of the City, and E. J. Oglesby, Alfred L. Wingo and Edward T. Justis, individually and constituting the Pupil Placement Board of the Commonwealth of Virginia. The action was brought not only on behalf of the plaintiffs but also as a class action on behalf of all other Negro children attending public schools in the Commonwealth of Virginia and particularly in the city of Lynchburg and the parents and guardians of such children who are similarly situated to the plaintiffs with reference to the matters involved in the suit.

The complaint makes various allegations as to the Constitution and statutes of Virginia relating to public education, including the creation and duties of the Pupil Placement Board and the local school board and superintendent of schools. It further alleges that the defendants, in assigning pupils to schools in Lynchburg, have discriminated against the plaintiffs and all other Negro children in Lynchburg in that all Negro children have been assigned to schools which no white children attend and all white pupils have been assigned to schools which no Negro children attend.

The complaint contains allegations with respect to the statutes from which one might infer that the plaintiffs were claiming that the Pupil Placement Act (Va.Code, §§ 22–232.1 to 22–232.17) is unconstitutional. However no direct allegation to that effect is made and the complaint does allege that the plaintiffs have complied with the provisions of the Pupil Placement Act but have been denied relief by the Pupil Placement Board. And the question of the constitutionality of the Act is ignored in the prayer for relief.

The complaint asks for an injunction restraining the defendants "from denying infant plaintiffs, or either of them, solely on account of race or color, the right to be enrolled in, attend and to be educated in, the public schools to which they, respectively, have sought admission." And plaintiffs' counsel explained in argument that this prayer for relief should be interpreted as a prayer for an injunction against the school board ordering the school board to admit the plaintiffs to the all-white E. C. Glass High School (hereinafter called Glass) for admission to which they had applied. And the court so interprets the prayer, though it might have been more directly stated.

The complaint also asks for a permanent injunction against all of the defendants restraining them "from any and all action that regulates or affects, on the basis of race or color, the initial assignment, the placement, the transfer, the admission, the enrollment or the education of any child to and in any public school", together with other prayers to substantially the same effect, and further that "the defendants be required to submit to the Court a plan to achieve a system of determining initial assignments, placements or enrollments of children to and in the public schools on a non-racial basis and be required to make periodical reports to the Court of their progress in effectuating a transition to a racially non-discriminatory school system." This latter prayer, as applied to the defendant Pupil Placement Board and its members, obviously asks that the Pupil Placement Board be required to bring in a plan of desegregation for the entire state. Counsel for the plaintiffs, however, stated that they had not intended to ask for such relief but had intended this particular prayer for relief to apply only to the Lynchburg School Board and the Superintendent of Schools of Lynchburg and the court will therefore limit its consideration of this prayer to those defendants.

A motion for an interlocutory injunction was filed and heard on September 22, 1961. The motion was denied on the ground that there had been no adequate showing that the plaintiffs would be irreparably damaged if the entering of

such injunctions as they might be entitled to were deferred until after a hearing on the merits of the case.

Motions to dismiss the complaint were made by the defendants, the grounds of which were that the bill of complaint attacked the constitutionality of the Pupil Placement Act and therefore could be heard only by a three-judge court under Title 28 U.S.C.A. §§ 2281–2284, and that the validity of the Virginia Pupil Placement Act should first be determined by the Supreme Court of Appeals of Virginia and a motion was also made to dismiss the local school board and Superintendent of Schools on the ground that they were not proper parties. In view of the concession of plaintiffs' counsel that the constitutionality of the Pupil Placement Act was not involved in the case and the allegations that the plaintiffs had complied with the provisions of the Act, the motions to dismiss the complaint were overruled and the motion to dismiss the local defendants was likewise overruled for reasons which will sufficiently appear in the following discussion.

The evidence showed in detail the placement system followed in Lynchburg and, apparently, in all other school divisions of the state except those which do not work through the Pupil Placement Board, either because they are operating under court injunctions which expressly or impliedly exempt them from so doing or because under the provisions of section 22–232.30 of the Code of Virginia they have elected to place all pupils locally rather than through the Pupil Placement Board.

The Pupil Placement Board has a form number 1 designated "Application for Placement of Pupil". This form gives certain fundamental data with respect to the pupil and contains space for a parent's or guardian's signature. At the bottom is a place for certain information to be filled in by the local school board including a recommendation as to the school to which the pupil should be assigned. In Lynchburg all white pupils eligible to enter high school are tentatively assigned by the several local school officials to Glass and all colored children to Dunbar High School (hereinafter called Dunbar). If these assignments are satisfactory to the parents of the child, who are required to sign the form, the name of the school to which the pupil is tentatively assigned by the local board is filled in on this part of the form. If, however, the parents object to the proposed assignment no recommendation for assignment is made by the local school board. Thus when the form reaches the Pupil Placement Board in Richmond the Board's clerical employees can ascertain by a quick glance at the form whether or not there is a dispute between the pupil's parents and the local authorities as to the school in which the pupil should be enrolled.

There are of course thousands of these forms filled out in a city the size of Lynchburg and they are brought together and all taken to Richmond and handed in a bundle to the appropriate personnel of the Pupil Placement Board.

Of course in the vast majority of cases the parents have been satisfied with the assignments and the individual applications in these cases are never seen by the individual members of the Pupil Placement Board itself. It adopts a general resolution assigning all of such pupils en masse to the schools to which they have been tentatively assigned by the local school authorities.

Thus while the Pupil Placement Board is theoretically charged by the Pupil Placement Act with the duty of assigning to the respective public schools of the state all of the children in the state who desire to enter such schools, it does not, and obviously could not, in fact consider all of the many thousand placements involved. It simply rubber stamps the vast majority which are non-controversial and acts in effect as an appeal board in those relatively few cases in which the child's parents and the local authorities are in disagreement as to the proper placement.

In the cases in which the child's parents have not been satisfied with the assignment that the local school board wished

to make, the applications are individually considered by the Board. But before acting on such an application the Pupil Placement Board asks the local school board to supply it with certain information. This information includes a statement of the distance between the home of the child and the school which the child wishes to attend and the distance between the home of the child and the school to which the local authorities would have recommended assignment had not the parents disagreed with such assignment. It also includes data with respect to the records of the children on certain achievement tests. In the case of three of the pupils involved in this case the tests were the Standard Achievement Test taken by them in the Fifth Grade, the California Mental Maturity Test taken by them in the Seventh Grade and a test designated on the form as D.A.T., apparently taken in the Eighth Grade and made up of a number of different parts. In the case of the fourth applicant the tests used were the same except that apparently that applicant had never taken the Standard Achievement Test.

Upon receipt of this information by the Pupil Placement Board the results of the tests that had been taken by the applicant are then compared with the results of the same tests given the other pupils enrolled in the grade with the applicant at the time the tests were taken, broken down into groups which roughly would correspond with the average group in the class, the below average group and the better-than-average group. And the individual applicant's results are then also compared with the averages on the same tests of the children in the same grades in the school the applicant seeks to enter, again roughly divided into the average group, the below average group and the better-than-average group.

In actually making the assignments the Chairman of the Board testified that the Board used only two criteria, first, distances between the child's home and the two schools and second, aptitude as determined by the above mentioned comparisons of test results. If the child lives at a greater distance from the school he wishes to attend than the school the school board would prefer to assign him to, he would be assigned by the Pupil Placement Board to the school to which the local board wished to assign him. And likewise if the results of the aptitude tests showed that the child would be in the below average group in the grade in the school to which he wanted to transfer, and substantially so, so that there would be real danger of his failing in that school, he would be denied the transfer sought even though he might live nearer to the school to which he wished to transfer than to the school to which the local authorities wished to assign him. If the child lived nearer to the school to which he wished to go than to the school to which the local authorities wished to assign him and if it appeared from the test results that he would do reasonably well in the school to which he wished to go he would be assigned to that school.

In the case at bar all four of the applicants were denied transfer on the ground that they lived nearer to Dunbar than to Glass and two of them were also denied transfer because of "lack of academic qualifications."

It was testified that the present Pupil Placement Board had, since the present members took office, assigned several hundred Negro students to white schools in the state and had denied transfers to a number of white students seeking transfer from one white school to another on the same bases that it had used in denying the transfers of the colored children involved in this case. There is no evidence to indicate that the Pupil Placement Board in its actions has been swayed in any way in making the relatively few assignments that it has made (aside from the wholesale ratification of the assignments agreed upon by the local boards and the children's parents) by any consideration of race. It has apparently applied its rigid formulae of distance and academic qualifications in the same manner to requests for transfers made by both colored and white children.

■ And of course the court recognizes the applicability and desirability of geographical or location or distance tests in many, perhaps most, plans of school assignment. The location of the child with respect to the school is perhaps the simplest and also one of the most important of all of the criteria which have been considered in the various plans that have been adopted. But to be valid the criterion of location or distance must be applied alike to colored and white children and cannot be used as an excuse for keeping certain colored children out of white schools when white children living in the same vicinity as such colored children are assigned to those same white schools.*

■ The difficulty here comes not, however, from discriminatory application by the Pupil Placement Board of its rather rigid assignment formulae but from the fact that the local authorities in Lynchburg have been giving effect to considerations involving the race of the children in the initial tentative placements and thereby putting colored children to the necessity of appealing to the Pupil Placement Board and thus subjecting themselves to its assignment formulae when white children similarly situated are not so subjected. The Lynchburg Superintendent of Schools testified that the practice of the school system was to recommend assignment of all white children to all-white schools and of all colored children to all-colored schools. Of course as above stated when the parents objected to the assignment no recommendation was made by the school board and the matter was referred to the Pupil Placement Board. The lack of recommendation was of course a flag to the Pupil Placement Board which indicated that the parents and the school officials had not agreed on an assignment.

The superintendent testified that there were Negro children who lived closer to Glass than to Dunbar but were nevertheless invariably assigned to Dunbar. He also testified that there were white children who lived nearer to Dunbar than to Glass but who were nevertheless invariably assigned to Glass. He also testified that if a white child moved from elsewhere into Lynchburg and his family settled in an area near the homes of the colored children involved in this suit and nearer to Dunbar than to Glass he would be assigned to Glass; and vice

---

* Nor does it follow that, if a plan of desegregation based on geographical considerations is adopted, all children in each geographical area must necessarily go to the school in that area to which those children are initially assigned. Most such plans provide for applications for transfers to other schools for a variety of reasons. The highly successful Louisville plan—one of the earliest—which was devised and put into effect by Omer Carmichael, a former superintendent of schools of Lynchburg, was based primarily on geographic assignments but with the provision that anyone dissatisfied with his assignment could apply for a transfer and with the further provision that in such event the request would be granted "within the capacities of the schools" and with due regard to certain other factors. And see also Judge John Paul's most recent, and as yet unreported, opinion in Allen v. School Board, the Charlottesville school case, in which he upholds the Board's practice of transferring upon request both white and Negro pupils whose initial assignments, based on home locations, placed them in schools in which they would have been in a racial minority. And the Sixth Circuit has in Kelley v. Board of Education, 270 F.2d 209 (cert. den. 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed. 2d 240), approved a plan containing a provision that, upon application of a pupil assigned on such a geographical basis to a school in which he would be in the racial minority, such pupil would have the absolute right, upon request, to be assigned to a school in which he would be in the racial majority. The Fifth Circuit on the contrary has held that such a provision would be unconstitutional as being based on race, Boson v. Rippy, 285 F.2d 43. The position of the Sixth Circuit and of Judge Paul is obviously that such a transfer is not based on race but on the child's preference. And it has not yet been held to be unconstitutional for individuals to prefer to associate with others of their own race, class, background or, if you like, prejudices.

versa, of course, with respect to a colored child moving into an area nearer to Glass.

In the light of this evidence there can be no doubt whatsoever but that if the four plaintiffs involved in this case had been white children they would have been assigned by the local authorities to Glass, irrespective of distances involved and academic qualifications, and they would never have been forced by the local authorities to submit themselves to the rigid distance and academic placement rules of the Pupil Placement Board. They have therefore been discriminated against because of their race.

It would follow that if this were the only consideration involved all four of the children should now be assigned to Glass. However, the welfare of the child must also be taken into consideration by the court. The court has examined with care all of the exhibits in evidence with respect to these children, including the results of the various aptitude tests and the comparison of the results thereof with results obtained at the same time in the same grades at Glass. As a result the court has come to the conclusion that it would not be in the best interests of two of the plaintiffs, Cecelia Karen Jackson and Brenda Evora Hughes, to be assigned to Glass. These reasons do not apply to the other two plaintiffs, Owen Calvin Cardwell, Jr., and Linda Darnell Woodruff, and the court, therefore, has already entered an order requiring the school board to enter them at Glass on January 29, 1962 which is the first school day after the so-called "January break" in the school year.

Subsequent to the entry of the order aforesaid the attorneys for the plaintiffs Cecelia Jackson and Brenda Hughes and their parents and next friends filed a "Motion for New Trial on Part of the Issues", in effect asking the court to reconsider its refusal to assign those two children to Glass. Counsel for both sides agreed to submit this motion to the court for decision without the taking of further evidence and without further argument except as set forth in the motion.

I have reconsidered the matter and am still of the same opinion and therefore overrule the motion.

It is true that the cases appear to be in some confusion or even conflict as to the extent to which the acadamic qualifications of applicants for transfer to another school may properly be considered in these desegregation cases and it has been stated that "An individual cannot be deprived of the enjoyment of a constitutional right, because some governmental organ may believe that it is better for him and for others that he not have this particular enjoyment." Dove v. Parham, 8 Cir., 282 F.2d 256, 258.

Nevertheless, in many cases academic qualifications have been considered and placements based thereon approved by the courts, at least in the initial steps towards establishing a desegregated school system. In Jones v. School Board of City of Alexandria, 4 Cir., 278 F.2d 72, at p. 77, our Court of Appeals said:

"The two criteria of residence and academic preparedness, applied to pupils seeking enrollment and transfers, could be properly used as a plan to bring about racial desegregation in accordance with the Supreme Court's directive."

The Court was there speaking of a plan to be followed by the school board in making assignments and transfers to bring about a desegregated school system. But if they can be so used by a school board they obviously can likewise be so used by a court when called to pass upon the propriety of what a school board or the Pupil Placement Board has done. And it is the judgment of this court that it is not only best for these two children but also for the achievement of a successful and orderly desegregation of Glass that these two children not be assigned to Glass in its first year of highly limited desegregation.

There remains for consideration the question of whether or not an injunction should be issued against the defendant school board and the Superintendent of Schools of the City of Lynchburg en-

joining them from taking any action in connection with the assignment of pupils to schools in Lynchburg on the basis of race or color.

In a series of cases that arose under the North Carolina Pupil Placement Act, the Court of Appeals for this Circuit has held that a suit asking for a mandatory injunction for admission to a white school may not be brought by a colored pupil who has not exhausted his administrative remedies under that Act. The North Carolina Act is somewhat similar to the Virginia Act but there is no state-wide pupil placement board endowed with the theoretical duty of assigning all of the pupils in the state or to which an appeal can be made from the placements made by the local boards. Appeal is made from the initial assignment to the local school board and from the local board to the courts.

In the cases above referred to, Carson v. Board of Education, 4 Cir., 227 F.2d 789; Carson v. Warlick, 4 Cir., 238 F.2d 724; Covington v. Edwards, 4 Cir., 264 F.2d 780 and Holt v. Raleigh City Board of Education, 4 Cir., 265 F.2d 95, none of the plaintiffs had properly exhausted their administrative remedies before the local boards and the court held that the suits could not be maintained. The question of whether or not a general injunction could be issued on behalf of other persons similarly situated was never reached since the plaintiffs were held to be without standing to maintain their respective suits.

The defendants here contend with some force that the logical result of these cases is that such an injunction can never be issued in a state in which there is a pupil placement act in effect which is valid on its face. Those pupils who have exhausted their remedy against the local school board can file a joint suit as have the plaintiffs in this case; and there presumably are no others who have exhausted their remedies (and there is no evidence in this case that there are any such others) and therefore there are no other persons *"similarly situated"* on whose behalf such an injunction may be issued.

That position may seem logical if stated as a result of the cases arising under the North Carolina Act and without reference to the facts as disclosed in the case at bar. However in this case we have heard from the testimony of the Chairman of the Pupil Placement Board that it would be idle for any Negro child situated as these plaintiffs are, i. e., with homes located nearer to the colored than the white school, to exhaust their administrative remedies by appealing to the Pupil Placement Board. They know in advance that such an appeal would be denied. And, as has been demonstrated above, the discrimination of which these plaintiffs complain and which is admittedly practiced against other colored children similarly situated comes not from the Pupil Placement Board which does not in fact make the initial assignments but from the initial assignments made by the local authorities on an admittedly racial basis, thus requiring what is in effect an appeal to the Pupil Placement Board, though that Board will not consider whether or not the initial assignment was racially inspired but merely whether the pupil in question lives closer to one school than to another and, if he lives closer to the school for assignment to which he has applied, whether his grades are good enough to justify the assumption that he will be fairly certain to pass in that school.

If the Pupil Placement Board is not going to fulfill the duty, with which it has been charged by statute, of making the initial assignments throughout the state (and obviously it cannot), then the only remedy for the discrimination found to exist in the initial assignments is by injunction directed to the appropriate school board and school officials who are in fact (though not in theory) in charge of making the initial assignments. When the initial assignments are admittedly made on a racial basis as is the case here, and the Pupil Placement Board on appeal to it will not consider whether the initial

placements have been made on a racial basis but only the location of the appellant's home and, if that location would entitle him to go to the school to which he has applied, his grades, requiring the exhaustion of such a "remedy" would be merely an exercise in futility.

In other words the gravamen of the complaint of these plaintiffs is not directed against the action of the Pupil Placement Board, which refused their transfers on the same basis that it would refuse a transfer to a white pupil, but against the initial assignment on a racial basis which necessitated an appeal to the Pupil Placement Board with full knowledge that under the circumstances of these plaintiffs the appeal would be of no avail.

■ And, as to these initial discriminatory assignments by the local authorities which are the true cause of their complaint, the situation of these plaintiffs is the same as all other Negro children in Lynchburg. And the fact that the plaintiffs in this case have exhausted their own administrative remedies, though there was no possibility under existing practice of their appeal being successful, becomes irrelevant to the issue before us—and perhaps indicates that a suit by these plaintiffs might have been heard before their administrative remedies were exhausted despite the cases above mentioned arising under the North Carolina Act. For the law never requires the doing of a vain thing. As said by Judge Soper in McCoy v. Greensboro City Board of Education, 4 Cir., 283 F.2d 667 at p. 670:

"* * * It is well settled that administrative remedies need not be sought if they are inherently inadequate or are applied in such a manner as in effect to deny the petitioners their rights. * * *"

■ Before a class action can be maintained in a state which has a pupil placement act it must be shown that exhausting administrative remedies in individual cases cannot, under existing practice, result in remedying the individual wrongs. These plaintiffs have done that. And since the Pupil Placement Board frankly does not purport to remedy on appeal all assignments on a racial basis but only certain assignments where the pupil lives nearer to the school to which he has applied, such an appeal is useless as far as eliminating the initial discrimination is concerned. And, as noted above, the law does not require the doing of a vain thing.

If the Pupil Placement Board is not going to make the initial placements of all public school students in the state (and, as indicated above, it obviously cannot) and if on appeal it is not going to consider whether or not those placements have been made on a discriminatory and racial basis, then obviously the appeal to the Pupil Placement Board can afford no adequate remedy to those children who have been discriminated against because of their race unless perchance they happen to live nearer to the school they wish to attend. Under these circumstances it would be almost a cruel joke to say that administrative remedies must be exhausted when it is known that such exhaustion of remedies will not terminate the pattern of racial assignment but will lead to a remedy only in a few given cases based on geography—a consideration which has been disregarded in the assignment of white pupils.

■ There is another result that would also flow from the acceptance of the defendants' argument which will be clearly contrary to the intent of the United States Supreme Court as indicated in the second Brown case (Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083) and Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19. These cases indicate that it is the duty of the federal district courts to supervise the process of desegregation of the schools in their respective districts. In the Brown case the court said at pp. 299–301 of 349 U.S., at p. 756 of 75 S.Ct.:

"Full implementation of these constitutional principles may require

solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal. Accordingly, we believe it appropriate to remand the cases to those courts.

"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.

"While giving weight to these public and private considerations, the courts will require that the defendants make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems relating to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system. During this period of transition, the courts will retain jurisdiction of these cases."

These remarks were obviously directed to the cases that were then before the court, but that the court expects those principles to be generally applicable to the process of desegregation is indicated by the Aaron case, which of course was not one of the cases decided by the Brown case, but one commenced later, and in which the court said at p. 7 of 358 U.S., at p. 1404 of 78 S.Ct.:

"Under such circumstances, the District Courts were directed to require 'a prompt and reasonable start toward full compliance,' and to take such action as was necessary to bring about the end of racial segregation in the public schools 'with all deliberate speed.' Ibid. Of course, in many locations, obedience to the duty of desegregation would require the immediate general admission of Negro children, otherwise qualified as students for their appropriate classes, at particular schools. On the other hand, a District Court, after analysis of the relevant fac-

tors (which, of course, excludes hostility to racial desegregation), might conclude that justification existed for not requiring the present non-segregated admission of all qualified Negro children. In such circumstances, however, the Court should scrutinize the program of the school authorities to make sure that they had developed arrangements pointed toward the earliest practicable completion of desegregation, and had taken appropriate steps to put their program into effective operation. It was made plain that delay in any guise in order to deny the constitutional rights of Negro children could not be countenanced, and that only a prompt start, diligently and earnestly pursued, to eliminate racial segregation from the public schools could constitute good faith compliance. State authorities were thus duty bound to devote every effort toward initiating desegregation and bringing about the elimination of racial discrimination in the public school system."

It is obvious that, if a general injunction requiring desegregation can never be issued against a school board or other assignment authority in a state in which a pupil placement act is in effect, then the courts can never perform this supervisory function which the United States Supreme Court has told them they should perform.

Furthermore, our own Court of Appeals which decided the cases relied on by the defendant has, in Allen v. County School Board of Prince Edward County, Va., 4 Cir., 266 F.2d 507, at p. 511, decided May 5, 1959 (by which time the Pupil Placement Act had assumed its present form), directed the District Judge to enter a general injunction against the County School Board of Prince Edward County, saying:

"The order of the District Court in the pending case will therefore be reversed and the case remanded with direction that the District Judge issue an order enjoining the defendants from any action that regulates or affects on the basis of color the admission, enrollment or education of the infant plaintiffs, or any other Negro children similarly situated, to the high schools operated by the defendants in the County; and requiring the defendants to receive and consider the applications of such persons for admission to the white high school of the County on a nonracial basis without regard to race or color; and to take immediate steps in this regard to the end that the applications be considered so as to permit the entrance of qualified persons into the white school in the school term beginning September 1959; and also requiring the School Board to make plans for the admission of pupils in the elementary schools of the County without regard to race and to receive and consider applications to this end at the earliest practical day. The order of the District Judge shall also provide that state laws as to the assignment of pupils to classes in the public schools of the County shall be observed so long as such laws do not cause discrimination based on race or color, and that the administrative remedies therein provided must be exhausted before application is made to the court for relief on the ground that its injunction is being violated; and the order shall further provide that the suit remain upon the docket of the court and that the court retain jurisdiction thereof for such further action as may be necessary, including the power to enlarge, reduce or otherwise modify the provisions of the decree."

An order will be entered herein in accordance with the direction of the Court of Appeals in the Allen case.