Cecelia **JACKSON**, an infant, etc., et al.

v.

The **SCHOOL BOARD OF** the **CITY OF LYNCHBURG, VIRGINIA,** et al.

**Civ. A. No. 534.**

United States District Court
W. D. Virginia,
Lynchburg Division.

April 10, 1962.

Reuben E. Lawson, Roanoke, Va., James M. Nabrit, III, New York City, for plaintiffs.

S. Bolling Hobbs, of Caskie, Frost Davidson & Watts, C. Shepherd Nowlin, City Atty., Lynchburg, Va., for defendants School Board of City of Lynchburg and M. L. Carper, Superintendent of Schools of City of Lynchburg.

A. B. Scott, of Christian, Marks, Scott & Spicer, Richmond, Va., for Pupil Placement Board.

MICHIE, District Judge.

Pursuant to opinion filed in this cause on January 15, 1962, D.C., 201 F.Supp. 620, and order entered thereon on January 24, 1962, the defendant School Board filed herein on February 24, 1962 a plan for the desegregation of the Lynchburg schools in accordance with the order aforesaid. The plaintiffs filed objections to the plan and the court heard evidence in support thereof and argument of the plaintiffs and defendants with respect thereto on March 15, 1962 at which time the defendants filed a formal motion for the approval of the plan.

The principal objections related to two features of the plan and there were other objections to other features and to the failure of the plan to cover certain other matters.

The two principal objections were, first, to the provision of the plan that "Commencing September 1, 1962, all classes in Grade One shall operate on a desegregated basis, and each September thereafter *at least* one additional grade shall be desegregated until all grades have been desegregated" and to the following provision: "Each pupil whose race is minority in his school or class may transfer on request."

These two important objections to the plan will first be taken up and then the other objections.

I. *Desegregation of at Least One Grade a Year.*

It should be noted to begin with that the plan is not strictly a grade-a-year

plan inasmuch as it provides for the desegregation of "*at least* one additional grade a year". Members of the School Board testified to their reasons for being unable to commit themselves to a speedier rate of desegregation in the earlier years, at the same time expressing their belief that greater progress would be made after certain immediate obstructions to general desegregation were overcome.

Mr. Carper, the Superintendent of Schools, testified that the capacity of the white elementary schools at present is 6,005 and that there are 6,061 children in those schools. In the white high school the capacity is 2,550 and the enrollment 2,901. On the other hand the Negro schools are not quite full.

Mr. Carper also testified:

"The problem of buildings is further intensified by the fact that many of the buildings are not located where the people live. People are moving away from the central section of town, for instance, to the outskirts. The buildings in the center of the town are not running at capacity and those on the outside are overcapacitied. That condition is a progressing condition."

Realizing that additional capacity would be necessary in the near future the School Board some time ago employed the University of Virginia Department of Education to make a survey and recommendations with respect to the Lynchburg schools. The final report of this survey had not been received at the time of the hearing but the survey was sufficiently far advanced for the Education Department of the University to have advised the Lynchburg School Board that they had definitely determined to advise the Lynchburg School Board to adopt what is known as a 6–3–3 plan throughout the city. This would mean 6 years of elementary school in one set of buildings, 3 years of junior high school in another set of buildings and 3 years of regular high school in a third set of buildings. To put this plan into effect would require the building of several new buildings to be used as junior high schools. The School Board has already begun to look for sites for these new buildings. When these new buildings have been made available the problems of space will have been solved, for the time being at least, and the Board and the Superintendent feel that more rapid progress could then be made toward desegregation than is now practicable. But there was testimony that several years always elapse between the time that a decision to build a new school is made and the time when it is ready for occupancy. For this reason the Board does not feel that it can commit itself to more than a grade-a-year of desegregation at this time but expects to be in a position to do so within several years.

The good faith of the Board cannot be questioned. Before this suit was instituted the School Board had already appointed its own committee on desegregation which had studied desegregation plans adopted elsewhere and had made good progress towards working out a plan which would probably have been put into effect this September even if there had been no litigation. As far as I am advised Lynchburg is the only community in the state of Virginia or, perhaps, in the entire territory of the Old Confederate States that has voluntarily undertaken to plan for desegregation, all of the others having awaited the start of litigation against them before taking any steps of their own.

And that the Lynchburg Board is still cooperating is shown by their failure to appeal the order of January 24th requiring them to file a plan of desegregation within 30 days. Most segregation orders are appealed by the local board as a matter of course and no one could have felt that an appeal in this case would have been frivolous as there was a serious question as to the right of the court to order the Board to file a plan in view of the cases in this Circuit arising from North Carolina mentioned in the opinion of January 15, 1962 which seem to require the exhaustion of legal remedies through the Pupil Placement Board by each child who might wish to go to an integrated school.

Though, as indicated above, the Lynchburg plan is not strictly speaking a grade-a-year plan there is ample authority for approving a grade-a-year plan. The leading case on the subject is perhaps Kelley v. Board of Education of the City of Nashville, etc., 6 Cir., 270 F.2d 209 (cert. den. 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed. 2d 240—though the denial noted that the Chief Justice and Justices Douglas and Brennan would grant certiorari limited to the question of the constitutionality of the provision that "explicitly recognized race as an absolute ground for the transfer of students between schools"). Other cases in which similar year-by-year plans have been upheld are Bush v. Orleans Parish School Board, 5 Cir., 242 F.2d 156; Goss v. Board of Education of City of Knoxville, D.C., 186 F.Supp. 559; and Ross v. President, etc., relating to Houston, Texas, referred to in Evans v. Ennis, 3 Cir., 281 F.2d 385, as having been decided on August 4, 1960 without an opinion.

Evans v. Ennis, supra, is the only case which I have found which disapproved a grade-a-year plan. That case, decided by a divided court with Judge Goodrich dissenting, involved the integration of the entire school system of the State of Delaware.

The opinion disapproved a grade-a-year plan largely because of the small number of Negro children it felt would take advantage of the opportunity to attend integrated schools so that the absorption of all of them at once would present no difficulty, but it also stressed other factors which differentiated the situation in Delaware from that in Nashville where the grade-a-year plan had been approved in the Kelley case. In fact it can hardly be said that the majority of the court in the Evans case took the view that the Kelley case had been erroneously decided. On the contrary they carefully distinguished the situation in Nashville from that in Delaware, saying at p. 393 of 281 F.2d:

" * * * Fifth, the circumstances of Kelley v. Board of Education of [City of] Nashville, supra, are not analogous to those at bar. The number of Negro children involved in the Nashville schools was substantially larger than the number with which we are concerned in the cases at bar. Nashville is a city of approximately 173,000 persons, of whom more than 28% are classified as Negroes. Many of the School Districts and High School areas of Delaware with which we are concerned are in rural or semi-rural areas and the number of presently segregated Negro school children involved in the whole of Delaware is much less than the number involved at Nashville. Integration problems are more difficult of solution in heavily populated urban areas. Moreover the City of Nashville lies in the deep South, a part of our Nation where emotional reactions concerning school integration are more intense than in our own State of Delaware. We think that the Court of Appeals for the Sixth Circuit had this fact in mind when it formulated its decision in the Nashville case. * * * "

While probably no two intergration problems are ever exactly alike the situation in Lynchburg is certainly much more comparable to that in Nashville than to that in the State of Delaware. The percentage of Negroes among the school children in Lynchburg is approximately 25% as against 28% in Nashville. The percentage of Negro children in the Delaware schools is nowhere stated in the opinion but the total number of Negro children is stated to have been only 6,813. The state had a population of 446,292 by the 1960 census while Lynchburg had then a population of 54,415. The total number of school children in Lynchburg is 11,920 or approximately 22% of its total population. If the percentage of school children to total population in Delaware is approximately the same as in Lynchburg there would be approximately 98,000 school children in Delaware of whom the 6,813 Negro pupils would

amount to slightly less than 7%—as compared with 25%· in Lynchburg.

Furthermore, while Lynchburg cannot be said to lie "in the deep South" as the court in Evans v. Ennis, supra, said of Nashville (and perhaps Nashville was not properly referred to as being in the deep South), nevertheless it is far more southern in tradition, sentiment and background than is the state of Delaware and the strength of southern feeling, prejudice if you want to call it that, is a fact that weighs heavily in these matters.

Some of the difficulties in adjustment that this situation brings about were mentioned in the testimony of the Superintendent of Schools quoted in the Kelley case at p. 217 of 270 F.2d:

"* * * There are a lot of adjustments to be made on the part of the Negro children (it's something they're not accustomed to), on the part of the white children (it's something they're not accustomed to), on the part of the parents, and on the part of teachers. It's something none of us are accustomed to. It involves more difficulty in adjustment than someone just looking on from the sidelines would recognize or realize, and I firmly believe that this adjustment can be made with less friction, it can be made with less disadvantage to everybody concerned, it can be made more smoothly, it can be made with less difficulty, psychologically, educationally, socially, and otherwise if it is done slowly. * * *"

And Mr. Carper, the Lynchburg Superintendent of Schools, testified in this case as follows:

"Of course, the pupil is the person most involved and most concerned, and the pupil is my greatest concern. Any adjustment for a child from one educational situation into another one creates problems, of course, and requires attention. If you have a large number of children requiring special attention, the time available is going to be divided between all of those children in a much smaller proportion than it would be if it were a smaller number of children. I think also as we work out problems, we gain experience; we learn how to handle things in a routine fashion rather than create a way of handling them."

I believe therefore that while Evans v. Ennis, supra, might be considered as properly decided under the situation existing in Delaware the situation existing in Lynchburg is substantially different, as it was in Nashville, New Orleans and other places in the South, and justifies a different result.

## II. *The Right to Transfer.*

Kelley v. Board, etc., supra, is again authority on this point. The Nashville plan included a transfer system allowing the transfer of white and Negro students who would otherwise be required to attend schools previously serving only members of the other race and allowing the transfer of any student from a school where the majority of the students were of a different race. The court in the Kelley case quoted from the well-known opinion of Judge Parker in Briggs v. Elliott, D.C., 132 F.Supp. 776, which is quite pertinent on this point. In that case Judge Parker said at p. 777:

"Having said this, it is important that we point out exactly what the Supreme Court has decided and what it has not decided in this case. It has not decided that the federal courts are to take over or regulate the public schools of the states. It has not decided that the states must mix persons of different races in the schools or must require them to attend schools or must deprive them of the right of choosing the schools they attend. What it has decided, and all that it has decided, is that a state may not deny to any person on account of race the right to attend any school that it maintains. This, under the decision of the Supreme Court, the state may not do directly or indirectly; but if the schools which it maintains are open to

children of all races, no violation of the Constitution is involved even though the children of different races voluntarily attend different schools, as they attend different churches. Nothing in the Constitution or in the decision of the Supreme Court takes away from the people freedom to choose the schools they attend. The Constitution, in other words, does not require integration. It merely forbids discrimination. It does not forbid such segregation as occurs as the result of voluntary action. It merely forbids the use of governmental power to enforce segregation. The Fourteenth Amendment is a limitation upon the exercise of power by the state or state agencies, not a limitation upon the freedom of individuals."

On the other hand it must be admitted that in Boson v. Rippy, 285 F.2d 43, the Court of Appeals for the Fifth Circuit came to the opposite conclusion, deeming a similar transfer provision to constitute a classification according to race saying at p. 48:

"Nevertheless, with deference to the views of the Sixth Circuit, it seems to us that classification according to race for purposes of transfer is hardly less unconstitutional than such classification for purposes of original assignment to a public school."

However, the court in the Boson case also held the transfer provision invalid as in diminution of the powers of the local school board in violation of certain Texas statutes, so that the expressed disapproval of the transfer provision as a violation of the United States Constitution can be regarded as merely dictum.

And as I noted in my original opinion in this case, Judge Paul, in his most recent opinion in the Charlottesville school case, Allen v. School Board, D.C., 203 F.Supp. 225, upheld the Board's practice of transferring upon request both white and Negro pupils whose initial assignments, based upon home locations, placed

them in schools in which they would have been in a racial minority. The fact that such transfers would, as a matter of right, be made upon request was not stated in the Charlottesville plan but the consistent practice was freely admitted in the hearing and the failure to state the practice in black and white could hardly make constitutional action which would be unconstitutional if stated.

The plaintiffs here in attacking the transfer provision rely upon the New Rochelle, N. Y., school case, Taylor v. Board of Education, etc., 2 Cir., 294 F.2d 36. In this case the city of New Rochelle was divided into various school districts surrounding each school and the children were all required to attend the school in the district in which they lived, no transfers being permitted. The school in the zone in which the plaintiffs lived was 94% Negro and 6% white. The plaintiffs contended that this made it a "segregated" school and insisted that they should be allowed to transfer to predominantly white schools in other school zones. And the District and Circuit courts, with strong dissent in each case, upheld the plaintiffs' position and ordered the Board to permit transfers.

There was, indeed, some testimony in the New Rochelle case that the School Board, by drawing the zone boundaries as it had, had deliberately brought about this condition back in 1930 and 1949. And apparently the case would not have been decided by the courts as it was had they not believed this testimony.

Nevertheless, the opinions in the case seem to me to disregard completely the statement of Judge Parker above quoted and in effect to hold that there is an obligation under the Constitution to provide every colored child with an opportunity to go to a predominantly white school, the District Court opinion (191 F. Supp. 181 at page 192), saying with reference to the Brown case, Brown v. Board of Education, 349 U.S. 294, 75 S. Ct. 753, 99 L.Ed. 1083:

" * * * The Court further emphasized the necessity of giving these

minority-group children the *opportunity for extensive contact with other children* at an early stage in their educational experience, finding such contact to be indispensable if children of all races and creeds were to become inculcated with a meaningful understanding of the essentials of our democratic way of life. That the benefits inherent in an integrated education are essential to the proper development of all children has been reiterated time and again by the many witnesses in the present case, including those called by the defendant." (Emphasis supplied.)

And again at p. 193:

"\* \* \* Necessarily implied in its proscription of segregation was the positive obligation of eliminating it. \* \* \*"

And in a later opinion of the District Court (195 F.Supp. 231, 235) the court said:

"Therefore, I find that at this time the device of permissive transfers will afford the Negro children in the Lincoln district their constitutional rights. \* \* \*."

This theory upon which the New Rochelle case was decided is, of course, contrary to Briggs v. Elliott, supra, and all the other decisions in the field. And it is interesting to note that reliance upon this case approving a provision for mandatory transfers upon request of Negro pupils out of the zone of their residence is being used in this case in opposition to a provision for mandatory transfers upon request of white children out of their zones of residence.

There is another factor which should tend to the approval of the transfer provision in this case unless it is clearly unconstitutional. If the transfer provision is not approved some white children will be compelled to go to predominantly colored schools if they are to go to public school at all. Given the temper of the times in the South, it seems most unlikely that this would occur in any substantial number of cases, if at all. One of three things would happen to the white children so affected: (1) Their parents would find the money, with the help of the tuition grants provided under Chapter 7.3 of Title 22 of the Code of Virginia, to send the children to private schools; (2) the children would remain without education since the compulsory education laws, formerly §§ 22.251 to 22.275 of the Virginia Code, were repealed by the General Assembly in the Extra Session of 1959; or (3) the family, possibly at some financial sacrifice, would move out of the predominantly colored school zone to a predominantly or exclusively white zone. None of these alternatives would help towards the more complete integration which the plaintiffs apparently desire. And certainly they could only harm the cause of race relations in the South.

Of course these last considerations do not bear on the constitutionality of the transfer clause but they do bear upon its wisdom, if it is found to be constitutional. And if Judge Parker's statement in Briggs v. Elliott, supra, is good law the transfer clause is clearly constitutional and hence, for the reasons above stated, should be retained in the Lynchburg plan.

### III. *Other Objections.*

There are a number of other objections raised by the plaintiffs to the plan which may be more summarily disposed of.

(1) It is objected that pupils in the upper grades will never obtain a desegregated education but this of course is true of any plan of gradual desegregation.

(2) Objection is made to a sentence in paragraph 2 of the plan as follows:

"One or more school buildings may be reserved in the discretion of the Superintendent, to provide facilities within which to place pupils who are granted transfers."

The objection made to this was that the defendants seek thereby to maintain certain all-white or all-Negro schools. It is possible that the provision could be used for this purpose but it is also obvious

that it might well facilitate the general operation of the plan. The court fully intends to keep this case on the docket for some years and if this provision is improperly used there will be time enough for the plaintiffs to object at that time.

(3) The fifth objection of the plaintiffs is to the fact that the school attendance areas are not set forth in the plan and that until they are it is not possible to determine whether any desegregation would be accomplished. Again objection on this point can be made when the areas are established by the Superintendent.

(4) The sixth objection is that certain details with respect to assignments, deadlines, etc. are not spelled out. These details also can be contested at the proper time when they have been worked out if in fact they should operate to the prejudice of the plaintiffs.

(5) Objection number eight is based on the fear that transfers will be used improperly. Again it will be time to complain of that if it happens.

(6) Objection number nine is that the plan does not provide for assignment of teachers and staff on a non-racial basis. This matter is not mentioned in the bill of complaint and therefore cannot be raised at this time in this suit.

(7) Objections ten and eleven likewise relate in the main to matters not covered by the bill of complaint such as special classes for handicapped or gifted children, adult education classes, vocational education, commercial education, etc.

(8) Objection number twelve is to the failure of the plan to make provision for the transfer to non-segregated schools of pupils in segregated schools who desire to take certain courses which are not given in the segregated schools. The provisions of paragraph 5 of the plan, to which the plaintiffs object on the ground that they are too broad, are in fact broad enough to provide for such transfers and thus cover this objection of the plaintiffs.

(9) Objection number thirteen is to the effect that the plan does not provide a method for notifying parents and children of their rights under the plan and the steps that they must take to take advantage of them. Needless to say these details need not be put in a general plan.

(10) Finally objection number fourteen is a catch-all to the effect that the plan is inadequate and not in accordance with the requirements of the Constitution. But I think that it is.

I have therefore approved the plan and an order will be entered accordingly.