Ralph BLOCKER, a minor, by Mr. and Mrs. Albert W. Knox, his guardians and next friend, et al., Plaintiffs,

v.

The BOARD OF EDUCATION OF MANHASSET, NEW YORK, Dr. Raymond L. Collins, Superintendent of Schools of the Board of Education of Manhasset, New York, Mrs. Daniel S. Brock, President, Board of Education of Manhasset, New York, Dr. Erwin W. Bard, William F. X. Geoghan, Jr., Walter W. Jeffers and Henry N. Patterson, Members of the Board of Education of Manhasset, New York, Defendants.

No. 62–C–285.

United States District Court
E. D. New York.

Jan. 24, 1964.

Robert L. Carter, Jawn A. Sandifer and Maria L. Marcus, New York City, for plaintiffs.

Robert S. Blanc, Jr., New York City (Casey, Lane & Mittendorf, Samuel M. Lane and William E. Kelly, New York City, of counsel), for defendants.

JOSEPH C. ZAVATT, Chief Judge.

*The Complaint*

This is a class action instituted by several Negro minors who reside within Union Free School District No. 6, Manhasset, New York (the District),

against the Board of Education of the District (sued herein as The Board of Education of Manhasset, New York), its members and its Superintendent of Schools. The plaintiffs allege that they and the members of their class are discriminated against by the defendants by being racially segregated in the use and enjoyment of the public schools of the District; that the defendants are denying them their rights under the Fourteenth Amendment to the Constitution of the United States [1] and the Civil Rights Act, 42 U.S.C. §§ 1981 and 1983.[2] They seek a declaratory judgment to the effect that the rules, regulations and procedures of the Board are unconstitutional because they require, permit or sanction racially segregated public schools. They seek, further, a permanent injunction restraining the defendants from continuing to enforce these rules, regulations and procedures; from assigning them to a racially segregated school; requiring the defendants to eliminate patterns of racial segregation; to submit a desegregation plan and to delineate and maintain new school attendance areas for the purpose of creating and perpetuating positive racial integration patterns. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(3).[3]

1. "Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

2. "§ 1981. Equal rights under the law
   "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. R.S. § 1977."
   "§ 1983. Civil action for deprivation of rights
   "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. R.S. § 1979."

3. "§ 1343. Civil rights and elective franchise
   "(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;"
   The court disregards the reference in the complaint to Section 1331 of Title 28 because it is inapplicable. Federal district courts have jurisdiction over an action brought under the Civil Rights Act without the allegation or proof of any jurisdictional amount. Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943).

*The District*

The Manhasset School District, comprising an area of approximately five and one half square miles, is shown on the following map:

It is situated along the north shore of Long Island, approximately 30 miles from and within commuting distance of New York City. The major portion of the District is at the base of Manhasset Peninsula in the Town of North Hampstead, Nassau County, New York. The southwest corner of the District extends into a part of the base of the Great Neck Peninsula. These two peninsulas form the eastern and western shores of Manhasset Bay. A small stream runs from Whitney Lake northwardly through a valley into the Bay. The District is bisected by a four lane, heavily trafficked, main arterial highway, Northern Boulevard, which runs northeastwardly and southwestwardly through the lower third of the District.

One Junior High School and one Senior High School, indicated at point 1 on the map, serve the entire District. The District is divided into three elementary school attendance areas, within each of

which there is a school for kindergarten through the sixth grade. Children living within each attendance area must attend the elementary school situated within that area; the transfer of a child living in one area to an elementary school within another area is not permitted. The Plandome Road School, indicated at point 2 on the map, serves an area of approximately three square miles. The Valley School, indicated at point 3 on the map, serves an area of approximately one-half square mile. The Munsey Park School, indicated at point 4 on the map, serves an area of approximately two square miles.

From the inception of the District during the early 1800's until 1928, all elementary school children attended one school situated on the site of the present Plandome Road School. At that time, most of the present Munsey Park and Plandome attendance areas were undeveloped. From approximately 1921 until an elementary school was erected in the present Valley area, some elementary grade classes were held for children residing in this section of the District in a rented store. It was in response to the demands of the residents of what is now known as the Valley area that the electors of the District approved an elementary school site on Spinney Hill (within that area) by a vote of 92 to 2 at a District meeting held May 11, 1928. At a meeting held February 18, 1929, they authorized the expenditure of $200,000 to erect an elementary school on this site. At a District meeting of the electors held May 7, 1929, the Board announced that it had fixed the attendance area lines for this school. No alteration of this attendance area has ever been made by the Board. The boundaries remain today as they were when first established, except for the fact that a small portion of this area was acquired by eminent domain for park purposes. The Valley attendance area is shown on the above map as lying within the heavy black lines at the southwest corner of the District.

From approximately 1929 on, other sections of the District developed steadily

as luxurious residential neighborhoods. By 1939, the Munsey Park area had developed to such an extent that a third elementary school area was carved out of the original District wide elementary school area and thus, by 1939, the District contained three elementary school areas. Certain modifications of the boundary line between the Munsey Park and Plandome Road attendance areas were made as the residential development of these two sections of the District progressed. These modifications are not material to the issues in this case. The Munsey Park attendance area lies within the heavy black lines drawn on the map through the eastern portion of the District. The Plandome Road attendance area lies between the other two. The undeveloped portion of the Plandome Road area is situated in the southerly portion thereof. It comprises the Whitney estate, an area of 600 acres—150 of which are within a 2 acre zoning use district; 450 acres of which are in a one-third acre zoning use district. If, as and when this estate is developed for residential purposes, it is estimated that it will have a capacity of approximately 1,075 one-family residences.

*The Elementary School Population of the District*

During the early 1920's, the Valley area was populated by seventy to eighty families, five of which (7%) were Negro. By 1933, the percentage of the Negro population had risen to between 30% and 40%; to 50% by 1940; 90% by 1950 or 1951. Although the record is silent as to the present percentage of Negro residents in the Valley area, the percentage of Negro students in the Valley School as of October 1, 1962 is indicative. Of the total of 166 children attending the Valley School all but 10 or approximately 94% are Negro.

No Negro children attend either the Plandome Road or Munsey Park Schools. At various times in the past, the only circumstance under which any Negro child attended these two schools was while his parents were live-in domestics

in the employ of residents of one of these areas. The total elementary school population of the entire District, as of October 1, 1962, was distributed as follows:

| Attendance Area | Enrollment Oct. 1, 1962 | Percentage of Total Enrollment |
|---|---|---|
| Valley | 166 | 12.38% |
| Plandome Road | 600 | 44.78% |
| Munsey Park | 574 | 42.84% |
| | 1,340 | 100.00% |

Of the 1,340 elementary school children in the District, 1,174 or 87.62% attend two all-white schools. All of the Negro children of the District attend the Valley School. The 10 white children attending the Valley School represent only 9/10ths of one per cent of the total white elementary school population of the District. Thus, 99.2% of the white children of the District attend two all-white schools, while 100% of the Negro children attend a separate school.

*The Wide Gap in Socioeconomic Levels*

To argue, as do the defendants, that Negro residents have come to the Valley voluntarily and segregated themselves is to ignore the actualities. The greater part of the District is populated by families whose incomes far exceed the national average. The majority of its residents are in the upper middle to high socioeconomic class. Only a small minority, the residents of the Valley, are in the low socioeconomic class. They are foreclosed from the Plandome Road and Munsey Park areas by reason of economic necessity.

The wide gap between the socioeconomic level of the Valley residents and that of the residents in the two other attendance areas is evidenced by the differences in residential development as well as parental occupation. The Munsey Park and Plandome Road areas of the District contain within their boundaries all or portions of several of the most attractive, desirable and expensive residential communities within the Town of Hempstead. It is apparent from personal inspection and expert testimony that only persons of considerable means can afford to purchase or lease and maintain the homes in these communities.

The Valley area is at the bottom of the real estate value scale. The most significant aspects of housing in this area are Spinney Hill Homes, a low-rent public housing project of the North Hempstead Housing Authority completed in December 1951 at a cost of $1,800,000, and Pond View Homes, another such project now under construction. Spinney Hill Homes consists of ten very attractive and apparently well constructed, garden type, two story brick buildings on eight acres adjacent to the Valley School. It provides 102 living units, ranging in size from 3½ to 6½ rooms, at rents so attractive that the project has been fully occupied ever since the date of its completion:

| Size of Apartment | 1951 Rent | | Present Rent | |
|---|---|---|---|---|
| | Per Month | Per Year | Per Month | Per Year |
| 3½ rooms | $36.50 | $438.00 | $52.00 | $624.00 |
| 4½ " | 39.50 | 474.00 | 57.00 | 684.00 |
| 5½ " | 42.50 | 510.00 | 61.00 | 732.00 |
| 6½ " | 49.50 | 594.00 | 64.00 | 768.00 |

The median annual income of families in the Valley area is $4,700. The annual family income of occupants of these public housing units is indicated by the tenant qualification provisions of the New York Public Housing Law, Mc-Kinney's N.Y.Laws, Public Housing Law, § 156, subd. 1, par. a. They limit the availability of such units to "persons or families of low income whose probable aggregate annual income during the period of occupancy does not exceed six times the rental." As to "persons or families with four or more dependents, such ratio shall not exceed seven to one." At these ratios, and in the absence of a special exception approved by the State Commissioner of Housing and Community Renewal, the maximum annual aggregate family incomes may not exceed:

| Size of Apartment | Present Annual Rent | Aggregate Family Income 6 to 1 | Aggregate Family Income 7 to 1 |
|---|---|---|---|
| 3½ rooms | $624.00 | $3,744.00 | $4,368.00 |
| 4½ " | 684.00 | 4,104.00 | 4,788.00 |
| 5½ " | 732.00 | 4,392.00 | 5,124.00 |
| 6½ " | 768.00 | 4,608.00 | 5,376.00 |

Apartments must be rented to eligible persons and families "without regard to race, religion, color or national origin" and priority and preference must be given to those eligibles residing within a radius of one mile of the project. Mc-Kinney's N.Y.Laws, Public Housing Law, § 156, subd. 5. The Authority keeps no records of the race or color of its tenants. Its Executive Secretary, however, estimates that in 1951 the 102 units were occupied by 30 white (29.4%) and 72 Negro (70.6%) families; that, presently, there are 17 to 18 white (16.6%) and 83 to 84 Negro (83.4%.) families in possession. This project is occupied by approximately 425 persons of whom roughly 175 are children.

In response to the need for additional low-rent housing in the Town of North Hempstead, the Authority is constructing Pond View Homes on a site approximately 1,200 feet east of the Valley School. It will be similar in construction and layout to Spinney Hill Homes; will consist of six buildings with a total of 52 units, ranging from 2½ to 7½ rooms; will cost approximately $1,500,000 and be ready for occupancy about April 1964. For a distance of approximately 3/10ths to 4/10ths of a mile from the Valley area and within the adjoining Great Neck School District, the socioeconomic level and the racial character are similar to those of the Valley area. The Authority has on hand applications for low-rent housing accommodations filed by 48 residents of the Manhasset School District and 67 residents of the Great Neck School District. In view of the preference which must be given to eligibles, regardless of race or color, residing within a radius of one mile of a public housing project, it is to be expected that the 52 units of Pond View Homes will be occupied by a preponderance of Negro families.

A comparison of the occupations of parents of the children attending the elementary schools in the three areas illustrates further the vast gap between the socioeconomic level of the Valley area and that of the Plandome Road and Munsey Park areas. See Appendix. Housing patterns as well as parental occupations indicate that the residents of the Munsey Park area are at the highest socioeconomic level; those in the Plandome Road area slightly below; those in the Valley area at a much lower level. The disparity is great.

*Comparative Scholastic Achievement*

Achievement tests are administered annually to all children in the 4th, 5th and

6th grades of the three schools. The tests of 5th and 6th grade children relate to paragraph meaning, word meaning, spelling, language, arithmetic reasoning and arithmetic computation. The tests of 4th grade children cover only average reading, paragraph meaning and word meaning. The defendants concede that, over the years, the scores of the Valley children, as a group, have been and continue to be from two to three grade levels below those of the children in the same grades at the other two schools, as groups, and approximately one grade level below the national norm, in terms of their scholastic achievement in the subjects covered by the tests.

The plaintiffs point to these comparative achievement scores as some evidence of alleged deprivation of equality of educational opportunity. The defendants counter that a comparison of such scores is meaningless unless scholastic achievement is measured against intellectual capacity; that the differences in the IQ ranges of the students in each school must be taken into consideration, see Bell v. School City of Gary, Indiana, 213 F.Supp. 819, 828 (N.D.Ind.), aff'd, 324 F.2d 209 (7th Cir. 1963), as well as the differences in their socioeconomic levels, including home environment and parental occupation. Reference to this aspect of the case is made below.

### The Concern of the Teachers

Long before this lawsuit, the teachers of the District expressed their concern about the education of the Valley children, at meetings of the All-School Council, a faculty organization composed of voting members who represent the faculty councils of their respective public schools of the District. Although the meetings of this Council are open to all public school teachers of the District and their ideas are welcomed, only those who officially represent their respective school councils may vote. Each elementary school council is represented by two voting members. It is not clear from the record whether the Junior and Senior High Schools are each represented by the same or a greater number of voting members. The Deputy Superintendent of Schools in Charge of Education, Dr. Henry M. Brickell, serves as Secretary of the Council, prepares the agenda for and the minutes of each meeting and distributes a copy of the minutes to all members of the staff. The Superintendent of Schools, the defendant Dr. Raymond L. Collins, presides as Chairman. It is to be noted that Dr. Collins and Dr. Brickell also attend all meetings of the defendant School Board; that Dr. Brickell serves as Secretary to that Board and that all communications addressed to the Board, including those from Dr. Collins, are routed through him.

### All-School Council Meeting of February 7, 1957

The agenda for the meeting of February 7, 1957, included consideration of the report of the Citizens' Committee on Enrollment and New Construction. The defendant School Board had been concerned about the problems that would arise if, as and when the Whitney estate were sold and developed to its estimated potential of 1,075 new homes. The defendant School Board had appointed a committee of citizens of the District to study student enrollment trends, future school building needs and to make recommendations as to appropriate action by the Board in the event of the sale and development of the Whitney estate. In November 1956 the Committee filed its final report, "A Study of School Building Problems of the Manhasset School District." Its long-range recommendations included: the erection of an elementary school building on the Whitney estate property, when it was sold for development, to accommodate the children who would then live in that area; continued use of the Valley and the Munsey Park elementary schools; the erection of a new, smaller elementary school building on the site of the present Plandome Road School; an additional elementary school building to be erected either in North Plandome or in the Strathmore-Vanderbilt section (a 15 acre school site in this section had been purchased by the de-

fendant District in 1945 for future use). A summary of this report was attached to and distributed with the agenda in advance of the All-School Council meeting of February 7, 1957 and each delegate was requested to solicit the reactions of as many faculty members as possible.

Although the report did not include the subject of eventual integration of the Valley School children, the teacher representatives brought it up at the meeting and requested that the entire staff consider it at the meeting of March 7th. The minutes of February 7th record:

"1. The eventual integration of children now attending the Valley School with children now attending other Manhasset public elementary schools in the district. Representatives seem to feel that each elementary school should have a student population which is culturally, socially and economically heterogeneous. Specific methods for doing this were discussed briefly but the discussion emphasized the objective rather than the techniques."

### All-School Council Meeting of March 7, 1957

This item failed to appear on the agenda for the meeting of March 7, 1957. Nevertheless, it was brought up again by teacher representatives. The minutes of this meeting record:

"Representatives discussed at some length various proposals for the immediate or eventual integration of children now attending the Valley School with children attending other elementary schools in the district. No one alternative was selected definitely, but feeling was strong that integration of the elementary school population was highly desirable."

Dr. Brickell testified that the opinions expressed at this meeting represented the consensus of opinion of those present; that these teachers expressed the opinion that it would be better if the Valley children were combined with those of the other elementary schools; that they referred to conditions in the community, as well as conditions in the school, which they felt would make for better education, if the children were combined. He testified, further, that these suggestions were not conditioned upon the breakup of the Whitney estate, although further suggestions were made with reference to that event.

### All-School Council Special Meeting of March 21, 1957 and Dr. Collins' Memorandum of March 25, 1957 to the Board

Dr. Brickell presided at this meeting in the absence of Dr. Collins. It was called to consider further what complete plan for major construction should be recommended to the Board. At the meeting the draft of Dr. Collins' tentative recommendations was discussed and a number of suggested changes were made. Following this meeting, Dr. Collins prepared his memorandum to the Board, dated March 25, 1957, a copy of which is attached to and incorporated in the minutes of the March 21st meeting. It constituted Dr. Collins' amended recommendations to the Board. As to "Long Range Plans," it included the continuance of the Valley School as a K–6 school "(or K–3 if necessary)," a further recommendation that "[t]he plans should be made in such a way that the eventual integration of the Valley School children with other elementary school children in the district will be possible" and a recommendation that a committee be appointed to study this problem:

"*Citizens Committee Study*—In view of the intense interest of the staff and the growing interest of a certain group of the Valley area residents in the eventual integration of Valley children with other elementary children, we would like to recommend to the Board that a large representative Citizens Committee of competent and respected residents be appointed to study this problem. It seems to us that this is a community problem as much as it is a school

problem. Consequently, we think that any solution of it will have to be made by a broadly representative group. Any work done by a Citizens Committee appointed by the Board would take an extended period of time and would perhaps be only a beginning toward designing suitable attendance areas."

(At the trial Dr. Collins, Dr. Brickell and members of the Board testified that they had never heard a complaint from any Valley parent about the racial composition of the student body of the Valley School; that the first such complaint was made by representatives of the local chapter of the NAACP when they met with Dr. Collins on November 11, 1961 and with the Board on January 22, 1962).

The defendants claim that this memorandum of Dr. Collins never reached the Board and was never discussed by it. Dr. Brickell testified that, although the report was prepared either by himself or by Dr. Collins or by both of them, he does not remember ever having received it or having sent it to the Board. Although he attends every Board meeting and serves as its Secretary, he could not say whether the report ever reached the Board. There was further testimony that the racial composition at the Valley School was never discussed at a Board meeting prior to that of January 22, 1962; that there had never been any formal discussion about this subject because the Board members did not consider it a pressing matter.

### All-School Council Meeting of January 16, 1958

During 1958, Dr. Collins was abroad studying educational practices. During his extended absence, Mr. Raffensperger, the Assistant Superintendent in Charge of Business, was appointed Acting Superintendent. In that capacity, he presided at Council meetings. Neither the agenda for nor the minutes of the December 1957 meeting are in evidence. But the agenda for the meeting of January 16, 1958 reports that the question of integration had been discussed again at the December meeting:

"1.  *The Question of Integration*— Last month representatives considered whether the staff should prepare a report to the Board of Education concerning the education of children who live in the Valley area of the School District. Some representatives thought that since some new construction is being planned, it would be desirable to look ahead and decide how to strengthen educational opportunities for the children in the Valley.

"This report would presumably be an analysis of the present situation with recommendations for improvements. Representatives who attended the last Council meeting can expand on this topic in your faculty meeting.

"Should the staff prepare such a report for the Board?"

The question of integration was discussed again at this January meeting, the minutes of which report:

"1.  *The Question of Integration*— The Council considered whether the staff should prepare some sort of report for the Board of Education pointing out the problems which the separate Valley School building creates for the education of children residing in the Valley area. The general characteristics of the Valley area as a matter for concern were weighed along with the educational opportunities. There seemed to be general agreement that the problem was not purely one of school location but that we could do much to help.

"Representatives tried to estimate the practical chances of getting any action at this time,

to [sic] probable attitude of the total Manhasset community toward a major change, and the best way to proceed as a staff. Some felt that we should make a statement as a professional group that would essentially put us on record as being dissatisfied with the present educational opportunities for Valley children; others felt that we should approach the problem through preliminary discussions with the Board of Education in which we explained our concern.

"After an extended discussion, the Council agreed that Mr. Raffensperger should select a group to explain to the Board orally and/or in writing what we see the problem to be."

No such group was selected by Mr. Raffensperger. The substance of this Council meeting was not reported to the Board of Education. Dr. Brickell does not know whether the minutes of this meeting were called to the attention of Dr. Collins nor does he recall discussing them with him upon his return. The subject of integrating Valley School children with other elementary school children was never again brought up at any meeting of the All-School Council.

### Another Instance of Teacher Concern

At an unspecified time before this lawsuit, a teacher in the Valley School had a conversation at a faculty meeting with Dr. Collins and Mr. Ramsey, the Principal of the Valley School. Although ground had not yet been broken for the second public housing project, it was about to get under way. She expressed her concern about the Valley children and expressed the opinion that they be integrated with the other elementary school children of the District. The substance of Dr. Collins' response was that

"he sympathized with the situation, he sympathized with the way the teachers felt; that he felt that he couldn't do anything, that it would be up to the community to make the move." This witness was no longer on the teaching staff of the District when she testified. She was, however, the only teacher of the District, past or present, to testify. Neither Dr. Collins nor Mr. Ramsey denied that this conversation took place.

### The Basic Contentions of the Parties

The plaintiffs contend that the racial imbalance in the Valley School is segregation in the constitutional sense and within the decision of the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); that segregated schools, be they segregated de jure or "de facto," are inferior per se and deprive children of minority groups of equal educational opportunities. This segregation, they contend, is the result of the defendant District's rigid neighborhood school policy; that, though innocent and harmless in its inception,[4] the continued enforcement of this policy results in the containment of all the Negro children of the District and is tantamount to a law compelling segregation of the races. The plaintiffs concede that the Valley School is equal to the all-white schools in facilities, programs, teaching materials, teaching and administrative staff, etc. Nevertheless, they contend that, though equal, the elementary schools of the District are separate; that, therefore, they fall within the prohibition of "separate but equal" laid down in Brown, supra. While the plaintiffs contend that damage flows from separate but equal school facilities as a matter of law, they contend further that they have proven damage in fact. Under either theory they claim a deprivation of rights guaranteed by the Fourteenth Amendment.

The defendants deny that Brown, supra, is controlling as a matter of law.

4. At the trial, the plaintiffs abandoned their allegation that the defendants conspired to deprive them of their constitutional rights when they established the Valley School attendance area in 1929.

They maintain that the neighborhood school policy of the District is color blind; that it operates equally upon all children within each attendance area, regardless of race or color; that the racial imbalance in the Valley area is a fortuitous circumstance due solely to the pattern of housing within the District for which they are not responsible; that, therefore, they are under no duty to change attendance area lines or modify their present attendance rules. They contend, further, that the plaintiffs and the class they represent are not being injured by the continuance of the Board's attendance rules. Under all of these circumstances, the defendants maintain that the plaintiffs have failed to prove any deprivation of Fourteenth Amendment rights.

### What Did Brown Decide?

"There seems to be a kind of spontaneous generation about the federal constitution; the more questions about it are answered, the more there are to be answered."[5] The Supreme Court was unanimous in disposing of what is one of the most important legal issues to have come before it during the past century. It vindicated the prophetic vision of Mr. Justice Harlan, the lone dissenter in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), and pierced "the thin disguise" of equal educational opportunity under segregation in public schools solely on the basis of race. Brown brought to an end the legal sanction of so-called "separate but equal" treatment of our Negro citizens.

The precise question before the Supreme Court in Brown was:

"Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities?" 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873.

5. Friendly, The Gap In Lawmaking—Judges Who Can't And Legislators Who Won't, 63 Colum.L.Rev. 787, 788 (1963).

It answered this question in the affirmative:

"We believe that it does. * * * To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. The effect of this separation on their educational opportunities was well stated by a finding in the Kansas case by a court which nevertheless felt compelled to rule against the Negro plaintiffs:

'Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of negro children and to deprive them of some of the benefits they would receive in a racial [ly] integrated school system.' " 347 U.S. at 493–494, 74 S.Ct. at 691, 98 L.Ed. 873.[6]

The Court held that the plaintiffs, "by reason of the segregation complained of," were deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. It did not decide whether such segregation violates the Due Process Clause. But, in Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), decided the same day, the Supreme Court held that the refusal to admit Negro children to a public school in the District of Columbia attended by white children, solely because of their race, was an arbitrary deprivation of

6. This was finding VIII of the District Court filed with the opinion but not reported in 98 F.Supp. 797 (D.Kan.1951).

liberty in violation of the Due Process Clause of the Fifth Amendment.

Because of the variety of local problems presented by the decision of the Supreme Court, it called for reargument as to how its decision was to be implemented and, among other things, directed that the reargument be addressed to these questions:

"4. Assuming it is decided that segregation in public schools violates the Fourteenth Amendment

"(a) would a decree necessarily follow providing that, within the limits set by normal geographic school districting, Negro children should forthwith be admitted to schools of their choice, or

"(b) may this Court, in the exercise of its equity powers, permit an effective gradual adjustment to be brought about from existing segregated systems to a system not based on color distinctions?" 347 U.S. at 495 n. 13, 74 S.Ct. at 692 n. 13, 98 L.Ed. 884.

After the reargument, the Court decided to direct compliance with its decision pursuant to the procedure suggested by its question 4(b). Accordingly, it remanded the cases to their respective District Courts to take proceedings necessary and proper to admit children to public schools on a racially nondiscriminatory basis. Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). It recognized that full implementation of the constitutional principles announced by the Court might require solution of varied local problems; that, once a prompt and reasonable start toward full compliance was made, the lower courts might find that additional time would be required to effectuate full compliance. The burden of proving the need of additional time was placed upon the defendants. They would be required to show a necessity therefor in the public interest and to demonstrate that they

were making good faith efforts to comply. It was in this connection that the Court said:

"*To that end*, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems." 349 U.S. at 300–301, 75 S.Ct. at 756, 99 L.Ed. 1083. (Emphasis added.)

Who read Brown with greater fidelity —those who praise it or those by whom it is condemned?[7] Speculation as to the implications of decisions of the Supreme Court is due, in large measure, to that Court's policy of strict necessity in disposing of constitutional issues; the policy to "decide constitutional questions only when necessary to the disposition of the case at hand"; not "to extend constitutional interpretations to situations or facts which are not before the Court." Sweatt v. Painter, 339 U.S. 629, 631, 70 S.Ct. 848, 849, 94 L.Ed. 1114 (1950). Is there in Brown an inconclusive ventilation of the general problem of public education and race relations, although the decision was limited to the facts before it?[8] This court is in agreement with the observation made by Judge Kaufman in Taylor v. Board of Education, 191 F.Supp. 181, 187 (S.D. N.Y.), 195 F.Supp. 231 (S.D.N.Y.), aff'd, 294 F.2d 36 (2d Cir.), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961):

"This decision heralded a new epoch in the quest for equality of the individual. It called for responsible public officials throughout the country to reappraise their thinking and

7. See Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv.L. Rev. 1, 32 (1959).

8. See Bickel, The Least Dangerous Branch, 176 (1962).

policies, and to make every effort to afford Negroes the more meaningful equality guaranteed to them by the Constitution. The Brown decision, in short, was a lesson in democracy, directed to the public at large and more particularly to those responsible for the operation of the schools. It imposed a legal and moral obligation upon officials who had created or maintained segregated schools to undo the damage which they had fostered. And, compliance with the Supreme Court's edict was not to be less forthright in the North than in the South; no double standard was to be tolerated."

One of the Brown cases on remand [9] and a succession of subsequent cases [10] contain statements as to what the Supreme Court did not decide. It is of little value in the present setting, however, to place undue emphasis upon what our highest tribunal has *not* decided; attention has been called above to what the Court *did* decide and to its time tested policy of drawing constitutional decisions no broader than is required by the case

before it. Several post-Brown cases involving public schools have stated, often gratuitously, that the Constitution does not require a general mixture of the races.[11] This doctrine, if it may be so called, has its inception in dictum found in Briggs v. Elliott, 132 F.Supp. 776, 777 (E.D.S.C.1955), one of the remanded Brown cases:

"[I]t is important that we point out exactly what the Supreme Court has decided and what it has not decided in this case. It has not decided that the federal courts are to take over or regulate the public schools of the states. It has not decided that the states must mix persons of different races in the schools or must require them to attend schools or must deprive them of the right of choosing the schools they attend. * * * The Constitution, in other words, does not require integration."

This construction draws continuing sustenance through a process in which each case relies upon the preceding one; it would appear that the ultimate and solitary source is this dictum in Briggs v. Elliott, supra. It has seemingly been

9. Briggs v. Elliott, 132 F.Supp. 776, 777 (E.D.S.C.1955).

10. See e. g., Kelley v. Board of Education, 270 F.2d 209, 228–229 (6th Cir.), cert. denied, 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed. 2d 240 (1959); Rippy v. Borders, 250 F. 2d 690, 692–693 (5th Cir. 1957); School Board v. Atkins, 246 F.2d 325, 327 (4th Cir.), cert. denied, 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed.2d 63 (1957); Avery v. Wichita Falls Independent School District, 241 F.2d 230, 233–234 (5th Cir.), cert. denied, 353 U.S. 938, 77 S.Ct. 816, 1 L.Ed.2d 761 (1957); School Board v. Allen, 240 F.2d 59, 62 (4th Cir. 1956), cert. denied, 353 U.S. 910, 77 S.Ct. 667, 1 L.Ed.2d 664 (1957); Evans v. Buchanan, 207 F.Supp. 820, 823–824 (D.Del. 1962); Thompson v. County School Board, 204 F.Supp. 620, 625 (E.D.Va. 1962); Jackson v. School Board, 203 F. Supp. 701, 704–705 (W.D.Va.), rev'd on other grounds, 308 F.2d 918 (4th Cir. 1962).

11. See Bradley v. School Board, 317 F.2d 429, 438 (4th Cir. 1963); Jeffers v. Whitley, 309 F.2d 621, 629 (4th Cir.

1962); Boson v. Rippy, 285 F.2d 43, 45–46 (5th Cir. 1960); Kelley v. Board of Education, 270 F.2d 209, 229 (6th Cir.), cert. denied, 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240 (1959); Borders v. Rippy, 247 F.2d 268, 271 (5th Cir. 1957), 250 F.2d 690, 692–693 (5th Cir. 1957); Avery v. Wichita Falls Independent School District, 241 F.2d 230, 233 (5th Cir.), cert. denied, 353 U.S. 938, 77 S.Ct. 816, 1 L. Ed.2d 761 (1957); Bell v. School City of Gary, Indiana, 213 F.Supp. 819 (N.D. Ind.), aff'd, 324 F.2d 209 (7th Cir. 1963); Evans v. Buchanan, 207 F.Supp. 820, 823–824 (D.Del.1962); Vick v. County Board of Education, 205 F.Supp. 436, 439 (W.D.Tenn.1962); Jackson v. School Board, 203 F.Supp. 701, 704–706 (W.D. Va.), rev'd on other grounds, 308 F.2d 918 (4th Cir. 1962). See also, Dillard v. School Board, 308 F.2d 920, 926–927 (4th Cir. 1962) (Bryan, J. dissenting), cert. denied, 374 U.S. 827, 83 S.Ct. 1864, 10 L.Ed.2d 1051 (1963); Taylor v. Board of Education, 294 F.2d 36, 47 (2d Cir.) (Moore, J. dissenting), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961).

adopted by courts in the Fourth, Fifth and Sixth Circuits. Even there, however, it appears to be in a state of diminishing force, if not outright erosion. See Dillard v. School Board, 308 F.2d 920 (4th Cir. 1962), cert. denied, 374 U.S. 827, 83 S.Ct. 1864, 10 L.Ed.2d 1051 (1963), McCoy v. Greensboro City Board of Education, 283 F.2d 667 (4th Cir. 1960). The Third Circuit appears to be of a contrary opinion. In reversing a District Court's approval of a desegregation plan, it stated its interpretation of Brown as follows:

"It is the fact that if the plan as approved by the court below be not drastically modified a large number of the Negro children of Delaware will be deprived of education in integrated schools despite *the fact that the Supreme Court has unqualifiedly declared integration to be their constitutional right.*" Evans v. Ennis, 281 F.2d 385, 389 (3rd Cir. 1960), cert. denied, 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365 (1961). (Emphasis added.)

Whatever may be the state of its continuing force, however, the doctrine has given rise to a series of statements, in cases involving a variety of factual situations, to the effect that geographical school districting is wholly permissible.[12] These statements stem from and are made in reliance upon what the lower court said upon the remand of Brown v. Board of Education in 139 F.Supp. 468, 470 (D.Kan.1955). There, the central principle of the plan submitted to the court by the school board required children to attend school in the district (at-

tendance area) in which they reside. This basic principle was objected to on the ground that one school attendance area was inhabited entirely by Negroes. Citing no authority, the court overruled this objection, stating:

"If it is a fact, as we understand it is, with respect to Buchanan School that the district is inhabited entirely by colored students, no violation of any constitutional right results because they are compelled to attend the school in the district in which they live."

The Supreme Court has not as yet been called upon to decide whether such a plan complies with its decision and directives.

Two cases, one in the Sixth and one in the Seventh Circuits, approach our problem. In Henry v. Godsell, 165 F.Supp. 87 (E.D.Mich.1958), plaintiffs challenged the selection of a new school building site because it would result in an almost exclusively Negro student body. Upon a finding that "the policies of the Board of Education were not motivated by racial considerations," the court dismissed the complaint, adding that "[t]he plaintiff has no constitutionally guaranteed right to attend a public school outside of the attendance area in which she resides." 165 F.Supp. at 91. It cited no authority for this proposition. In Bell v. School City of Gary, Indiana, supra, the court, relying upon Brown v. Board of Education on remand, 139 F.Supp. 468, stated clearly the basis upon which it subordinated the demand for an integrated school to the inviolability of a school attendance area. It also regarded as significant question 4(a) posed by the

12. See Dodson v. School Board, 289 F.2d 439, 442 (4th Cir. 1961); Holland v. Board of Public Instruction, 258 F.2d 730, 732 (5th Cir. 1958); Monroe v. Board of Comm'rs, 221 F.Supp. 968, 973–974 (W.D.Tenn.1963); Bell v. School City of Gary, Indiana, 213 F.Supp. 819 (N.D.Ind.), aff'd, 324 F.2d 209 (7th Cir. 1963); Evans v. Buchanan, 207 F.Supp. 820, 824 (D.Del.1962); Thompson v. County School Board, 204 F.Supp. 620, 622–624 (E.D.Va.1962); Allen v. School Board, 203 F.Supp. 225, 227 (W.D.Va.

1961), cert. denied, 374 U.S. 827, 83 S. Ct. 1864, 10 L.Ed.2d 1051 (1963); Henry v. Godsell, 165 F.Supp. 87, 90–91 (E.D.Mich.1958); Brown v. Board of Education, 139 F.Supp. 468, 470 (D.Kan. 1955). See also, Dillard v. School Board, 308 F.2d 920, 926 (4th Cir. 1962) (Bryan, J. dissenting), cert. denied, 374 U.S. 827, 83 S.Ct. 1864, 10 L.Ed.2d 1051 (1963); Taylor v. Board of Education, 294 F.2d 36 (2d Cir.) (Moore, J. dissenting), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961).

Supreme Court for reargument, whereas that Court, after reargument, made its directions in accordance with question 4(b). See page 219, supra. Moreover, the court in Bell v. School City of Gary, Indiana, supra, emphasized that portion of question 4(a) stated in terms of "the limits set by normal geographic districting" but not that portion of the question as to whether "Negro children should forthwith be admitted to schools of their choice." This court cannot subscribe to a method of judicial interpretation which incorporates into the opinion of the Supreme Court questions propounded by it.

The court in Bell, supra, then interpreted the instructions handed down by the Supreme Court, after reargument, as "clearly indicat[ing] that the Supreme Court intended that the desegregation policy was to be carried out within the framework of 'school districts and attendance areas.'" 213 F.Supp. at 830. This conclusion is based upon only a portion of the instructions of the Supreme Court. After reading these instructions in their entirety and within their proper context, this court cannot find the "clearly indicate[d]" intention which the court in Bell, supra, ascribes to the Supreme Court. Moreover, it should be noted that these instructions were addressed to considerations "which might justify a decree requiring something less than immediate and total desegregation"; they "reflected no more than a recognition of the unusual and particular problems inhering in desegregating large numbers of schools throughout the country." Watson v. City of Memphis, 373 U.S. 526, 531, 83 S.Ct. 1314, 1317, 10 L.Ed.2d 529 (1963).

In Bell the court concluded that there was "no support for the plaintiffs position that the defendant has an affirmative duty to balance the races in the various schools under its jurisdiction, regardless of the residence of students involved." Bell v. School City of Gary, Indiana, supra, 213 F.Supp. at 831. The question, however, is not whether the State has

an affirmative duty to balance the races, but, rather, whether it is to be enjoined from countenancing, and thereby perpetuating, a system of virtually separate elementary schools for Negro and white children. To frame the question otherwise would, in the instant case, be delusive; indeed, the law in this Circuit, although it has yet to be fully established, would appear to warrant a more realistic appraisal of the defendants' constitutional obligations.

Taylor v. Board of Education, supra, although pertinent, is not clearly apposite. One court has interpreted Taylor, disapprovingly, as holding "that there is an obligation under the Constitution to provide every colored child with an opportunity to go to a predominantly white school." [13] This court does not interpret Taylor as so holding. Both the District Court and the Court of Appeals predicated their opinions upon a finding of intentional gerrymandering. See also, Board of Education v. Taylor, 82 S.Ct. 10 (1961). Nevertheless, the District Court construed Brown as mandating a single standard for school boards throughout the nation and as interdicting segregation whether initially created or subsequently maintained. The Court of Appeals noted "the interesting issue [of] how far a public body may save itself from constitutional constraint by mere inaction." 294 F.2d at 39 n. 2.

Branche v. Board of Education, 204 F. Supp. 150 (E.D.N.Y.1962) is the only other case in this Circuit in which the basic question presented in the instant case has been discussed. What was said there by my distinguished colleague, Judge Dooling, was not dispositive of the plaintiffs' claims; he merely passed upon the defendants' motion for summary judgment—which he denied. In so moving, the defendants contended that:

"plaintiffs' claim is fatally defective because it requires for its support an affirmative legal duty to integrate educational facilities and there is no

13. Jackson v. School Board, 203 F.Supp. 701, 705, (W.D.Va.1962).

such legal duty as distinguished from a duty not to segregate children racially for educational purposes." 204 F.Supp. at 151.

Speaking of segregated education, he said:

"That it is not coerced by direct action of an arm of the state cannot, alone, be decisive of the issue of deprivation of constitutional right. * * * [I]t (the school board) cannot accept and indurate segregation on the ground that it is not coerced or planned but accepted.

"Failure to deal with a condition as really inflicts it as does any grosser imposition of it. * * *

"So here, it is not enough to show that residence accounts for the fact of segregation and to contend that therefore the segregation is ineluctable." 204 F.Supp. at 153.

To the extent that my associate construes the Constitution as requiring, under certain circumstances, something more than mere passivity by a school board, this court is in agreement. See also Jackson v. Pasadena City School District, 59 Cal. 2d 876, 31 Cal.Rptr. 606, 609–610, 382 P.2d 878, 881–882 (1963). The Fourteenth Amendment does not cease to operate once the narrow confines of the Brown-type situation are exceeded; the Supreme Court has made it clear that it is the duty of the courts to interdict "evasive schemes for segregation whether attempted 'ingeniously or ingenuously,'" Cooper v. Aaron, 358 U.S. 1, 17, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5 (1958), and has reaffirmed that objective in a recent decision on the subject. See Goss v. Knoxville Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963). Viewed in this context then, can it be said that one type of segregation, having its basis in state law or evasive schemes to defeat desegregation, is to be proscribed, while another, having the same effect but another cause, is to be condoned? Surely, the Constitution is made of sturdier stuff.

*The Neighborhood School Policy*

The New York Education Law does not specifically empower a school board of a Union Free School District to prescribe school attendance areas. Section 1709 thereof, however, does empower and place a duty upon the Board of Education of every such district "[t]o adopt such by-laws and rules for its government as shall seem proper in the discharge of the duties required under the provisions of this chapter." McKinney's N.Y.Laws, Education Law, § 1709, subd. 1. The Commissioner of the New York Education Department has determined that school boards are empowered by the New York Education Law to prescribe attendance areas. Matter of Wadsworth, 1 Education Department Reports 154 (1958).

The rule or regulation of the defendant School Board, delineating the three attendance areas and requiring children to attend school within their respective areas, is commonly referred to as the neighborhood school policy. It is not unique to the Manhasset School District. It has been used with success throughout the Nation for many years. Bell v. School City of Gary, Indiana, supra, 213 F.Supp. at 829. There is general agreement among educators that such a policy is sound.

A neighborhood school has several advantages. Some are minimal; others could apply equally to other methods of pupil assignment. Easy access and the feasibility of lunch at home are two obvious advantages. Administrative officials of the Manhasset School system who testified emphasized the advantages of the homogeneous student body which results from the requirement that children attend the school within their neighborhood. It was their opinion that the homogeneity of the students at the Valley School, for example, affords a greater opportunity to the school administrators and the members of the faculty to gear the operation of the school so as to provide optimum benefits to its students by an educational program designed to meet

their particular needs. No teacher so testified. The view of the teaching staff is recorded in the minutes of All-School Council meetings, referred to above, held long before the plaintiffs brought this action. They do not subscribe to the alleged advantages of a homogeneous student body. On the contrary, they "feel that each elementary school should have a student population which is culturally, socially and economically heterogeneous." Expert witnesses for the plaintiffs testified to the same effect. The testimony of defendants' witnesses as to the alleged advantage of a homogeneous student body, would appear to be at variance with the recommendation to the Board made by the Superintendent of Schools in his memorandum of March 25, 1957, in which he recommended plans looking toward "the eventual integration of the Valley School children with other elementary school children in the district." Were it a fact that the homogeneity produced by a neighborhood school policy is an important educational advantage, it should be as valid tomorrow as it is today.

There are circumstances under which some educators believe that the advantages of the neighborhood school policy are outweighed by its disadvantages and that rigid adherence thereto must yield to some extent. This is the view of the Commissioner of Education of the State of New Jersey, Fisher v. Board of Education, Decision No. C–421, May 15, 1963, and is the rationale of the decision of the Commissioner of Education of the New York Education Department in Mitchell v. Board of Education, Decision No. 7240, June 17, 1963, determination of the Commissioner annulled sub nom., Matter of Vetere, 1963, Sup., 245 N.Y.S. 2d 682. It would appear that the California State Board of Education recognizes circumstances under which a rigid neighborhood school policy must yield to other considerations. Jackson v. Pasadena City School District, supra, 59 Cal.2d 876, 31 Cal.Rptr. at 610 n. 1, 382 P.2d at 882 n. 1. In Cooper v. Aaron, supra, 358 U.S. at 25, 78 S.Ct. at 1413, 3 L.Ed.2d 5,

Mr. Justice Frankfurter observed that "[l]ocal customs, however hardened by time, are not decreed in heaven." Judge Kaufman, in Taylor v. Board of Education, supra, noted this observation, adding that "[t]he neighborhood school policy certainly is not sacrosanct. It is valid only insofar as it is operated within the confines established by the Constitution." 191 F.Supp. at 195.

It cannot be said, however, that the policy of confining student attendance to the school nearest their residence is devoid of rationality. One school of thought contends that review of state action is available only "when those who have the right to make laws have not merely made a mistake, but have made a very clear one,—so clear that it is not open to rational question." Thayer, The Origin and Scope of the American Doctrine of Constitutional Law, 7 Harv.L. Rev. 129, 144 (1893). The general rule is stated in McGowan v. State of Maryland, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961), as follows:

> "Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

But this view is not without its limitations. In Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960), the Court said:

> "In a series of decisions [the Supreme Court] * * * has held that, even though the governmental purpose be legitimate and substan-

tial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose."

As to "fundamental liberties protected by the Fourteenth Amendment, it will not do to urge in justification of that abridgement simply that the statute is rationally related to the effectuation of a proper state purpose. A closer scrutiny and stronger justification than that are required." Poe v. Ullman, 367 U.S. 497, 554, 81 S.Ct. 1752, 1782–1783, 6 L.Ed.2d 989 (Harlan, J. dissenting) (1961). Although the judiciary must proceed cautiously in reviewing state action, timidity in the face of an alleged violation of fundamental rights is an equal danger to our unique system of government. "Judicial self-restraint which defers too much to the sovereign powers of the states and reserves judicial intervention for only the most revolting cases will not serve to enhance Madison's priceless gift of 'the great rights of mankind secured under this Constitution.' For these secure the only climate in which the law of freedom can exist." BRENNAN, The Bill of Rights and the States, in THE GREAT RIGHTS 86 (Cahn ed. 1963).

### Is There Segregation in the Manhasset School District?

One hundred per cent of the Negro elementary school children are contained in one school separate and apart from 99.2% of the white elementary school children of the entire District. The population trend of the Valley area from 1933 to date, as a result of which this area is now a predominantly Negro community, is a forecast of things to come. Were there Negro children in the two all-white schools, it could be argued that there was mere racial imbalance in the three elementary schools; that the Negro children of the entire District, though not distributed proportionately throughout all of the elementary schools, were not separated from their white contemporaries as they are here. The facts in the instant case present a situation that goes beyond mere racial imbalance. It is not unreasonable to draw from the evidence in this case the inference that the small residuum of white children at the Valley School will soon disappear. But upon the facts as they exist today, the separation of 100% of the Negro children from 99.2% of the white children approximates closely the total separation condemned in Brown. The fact that 100% of the Negro children are not separated from 9/10ths of one per cent of the white children does not divest it of its segregated character. Cf. Taylor v. Board of Education, supra, 191 F.Supp. at 193, 294 F.2d at 39, Jackson v. Pasadena City School District, supra, 59 Cal.2d 876, 31 Cal.Rptr. at 609, 382 P.2d at 881. Neither Taylor, supra, nor Bell, supra, presented a separation of the races that even approaches that existing in the Manhasset School District. In Taylor, only 1/3rd of the Negro elementary school children of New Rochelle attended the Lincoln School. Bordering that school were five other elementary schools with percentages of Negro students ranging from approximately 17% to approximately 50%. In Bell, despite the fact that 53.5% of the total school population is Negro, the school system has a substantial degree of integration. Although the opinion in Henry v. Godsell, supra, does not indicate the extent of integration in the schools of the Pontiac School District, it would appear that that school system has a degree of integration and that the entire Negro student population is not separated as in the Manhasset School District.[14] See also Fisher v. Board of

14. The district covers a large area embracing the City of Pontiac (with a population of 85,000—of which approximately 11,000 are Negro); parts of six adjoining townships; the City of Sylvan Lake and the Village of Lake Angeles. Seventeen of its thirty-one schools are attended by Negroes, the percentages of

Education, supra, in which the elementary school system of the City of Orange, New Jersey, was substantially integrated, despite the fact that one of the eight elementary schools had a Negro population of 99%—the ratio in the other seven schools ranging from 19% to 66%; Mitchell v. Board of Education, supra, in which the elementary school system of Malverne, New York, was substantially integrated, having three elementary schools—in two of which the Negro student body was 14%, although it was 75% in the third school. For all practical purposes, the elementary school system of the defendant District, unlike the school districts in these cases, is as racially segregated as those in Brown. "Law addresses itself to actualities." Griffin v. Illinois, 351 U.S. 12, 23, 76 S.Ct. 585, 592, 100 L.Ed. 891 (1956).

The defendants deny that the continuance of the rigid neighborhood school policy, permitting no transfers under any circumstances, discriminates against the Negro elementary school student population. They hark back to the original, innocent delineation of the Valley area in 1929 as justification for its continuance. They contend that, because the original delineation of the lines of this area was not racially motivated, it must follow that its continuance is beyond the scrutiny of the Fourteenth Amendment; in other words, what they are doing in the 1960's must be tested in the light of what they or their predecessors did in 1929.

 The defendants are, and for several years have been, fully aware of the total separation of the entire Negro elementary school population from over 99% of their white contemporaries. With knowledge of this fact, were they to prescribe today the attendance area lines which now exist could such action be justified by the normal criteria supporting the neighborhood school policy? Were the Board to create out of the total

District one disproportionately small attendance area, provide a school for a disproportionately small student body composed almost entirely of Negro children and representing 100% of the Negro student population of the District, and couple such action with a rigid no-transfer policy—were the Board to take such action today would it not be reasonable to regard it as a rather ingenuous device to separate the races, protestations to the contrary notwithstanding? Could such attendance lines, if drawn today, be insulated from the Fourteenth Amendment merely because the bylaw or rule of the Board did not mention the word Negro, but, rather, was cast in terms of residence?

The defendants argue that the cause of this racial separation in the District differs from that in Brown; that, here, the Negroes have segregated themselves by moving into the Valley area voluntarily in order to benefit from and enjoy the dual attractions of low-rent housing and a good, conveniently located school for their children. True it is that they have taken up residence in the Valley area under no compulsion of law but, rather, under that of the purse. Considering the disparity in socioeconomic levels within the District, their selection of the Valley was only Hobson's choice.

On the facts of this case, the separation of the Negro elementary school children is segregation. It is segregation by law—the law of the School Board. In the light of the existing facts, the continuance of the defendant Board's impenetrable attendance lines amounts to nothing less than state imposed segregation. The defendant Board "cannot accept and indurate segregation on the ground that it is not coerced or planned but accepted. Failure to deal with a condition as really inflicts it as does any grosser imposition of it." Branche v. Board of Education, supra, 204 F.Supp. at 153. See also Jackson v. Pasadena City School District,

whom are not disclosed. The locations of the 14 all-white schools are not stated. How many of these schools are in sub-

urban areas and the racial composition of these areas are not indicated.

supra. Cf. Lynch v. United States, 189 F.2d 476, 479 (5th Cir.), cert. denied, 342 U.S. 831, 72 S.Ct. 50, 96 L.Ed. 629 (1951); Catlette v. United States, 132 F.2d 902, 907 (4th Cir. 1943).

This segregation is attributable to the State. The prohibitions of the Fourteenth Amendment "have reference to actions of the political body denominated a State, by whatever instruments or in whatever modes that action may be taken. * * * Whoever, by virtue of public position under a State government, * * * takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State." Ex Parte Virginia, 100 U.S. 339, 346–347, 25 L.Ed. 676, 679 (1880). "The situation here is in no different posture because the members of the School Board and the Superintendent of Schools are local officials; from the point of view of the Fourteenth Amendment, they stand in this litigation as the agents of the State." Cooper v. Aaron, supra, 358 U.S. at 16, 78 S.Ct. at 1408, 3 L.Ed.2d 5.

In a publicly supported, mandatory state educational system, the plaintiffs have the civil right not to be segregated, not to be compelled to attend a school in which all of the Negro children are educated separate and apart from over 99% of their white contemporaries. That they are being so compelled is a fact.

### Have The Plaintiffs Been Injured By This Segregation?

■■ In order to obtain relief the plaintiffs must establish that they have been injured as a result of the state action complained of. See Taylor v. Board of Education, supra, 294 F.2d at 46 (Moore, J. dissenting). The defendants contend that the plaintiffs have failed to sustain this burden of proof. Many days, hundreds of pages of testimony and numerous exhibits centered around the question as to whether or not the underachievement of the Valley children is attributable to the segregated character of the Valley School. The plaintiffs did not establish by a fair preponderance of the evidence that their underachievement shown by the tests adverted to above, is due solely to the racial composition of their school. A study by the New York State Department of Education, the Quality Measurement Project, supports the thesis that there is a correlation between scholastic achievement and socioeconomic level. It should be noted, however, that this study did not include race as a possible factor. Other evidence supports the thesis that there is a correlation between scholastic achievement and intellectual potential, as measured by intelligence quotient (IQ) tests. The comparative IQ ratings of the children tested in the three schools in 1961 reveal that the IQ of the Valley children is lower than those of the children in the all-white schools:

|  | Valley School | Plandome Road School | Munsey Park School |
|---|---|---|---|
| **4th Grade** | | | |
| Range | 83 to 102 | 79 to 136 | 85 to 141 |
| Median | 89.7 | 103.3 | 110.8 |
| Below 90 | 8 out of 15 | 11 out of 69 | 2 out of 82 |
| 90 or above | 7 " " 15 | 58 " " 69 | 80 " " 82 |
| **6th Grade** | | | |
| Range | 70 to 134 | 92 to 145 | 78 to 161 |
| Median | 93.5 | 117.2 | 120.8 |
| Below 90 | 6 out of 17 | None of 85 | 1 out of 89 |
| 90 or above | 11 " " 17 | 85 of 85 | 88 " " 89 |

Psychologists are not as knowledgeable about intelligence as some might expect. They are not certain as to what intelligence is, much less how to measure it with any degree of accuracy. Nor is there agreement as to whether intellectual potential (IQ) as measured is capable of improvement or is a fixed characteristic; or whether IQ tests are culture dominated and, thereby, underestimate the intellectual potential of children in the low socioeconomic stratum. This uncertainty stems from the attempt to measure human beings. The process is not as simple as that of measuring a machine-made tool with a micrometer. But, despite the infirmities and uncertainties of presently available means of measuring estimated intellectual potential and scholastic achievement, [the evidence in this case falls short of establishing a causal relation between the scholastic achievement of the Valley children and their separation from practically all of their white contemporaries.]

The denial of the right not to be segregated cannot be assuaged or supported by evidence indicating that underachievement in the three R's may be due in whole or in part to low socioeconomic level, home influence or measured intelligence quotient. The role of public education in our democracy is not limited to these academic subjects. It encompasses a broader preparation for participation in the mainstream of our society. Public education "is the very foundation of good citizenship." Brown v. Board of Education, supra, 347 U.S. at 493, 74 S.Ct. at 691, 98 L.Ed. 873. The extent to which this objective is being attained is not measureable by a comparison of achievement in the 3 R's to IQ, or to socioeconomic level. Nor can segregation be justified on the basis of the opinion of the defendants that it enures to the benefit of those segregated.

> "[A]cademic or administrative criteria (cannot) be applied so as to preserve officially imposed segregation. These factors must of necessity be subordinated to constitution-

al rights, and cannot be utilized to prevent the vindication of these rights. 'An individual cannot be deprived of the enjoyment of a constitutional right, because some governmental organ may believe that it is better for him and for others that he not have this particular enjoyment. The judgment as to that and the effects upon himself therefrom are matters for his own responsibility.' Dove v. Parham, 8 Cir., 1960, 282 F.2d 256, 258." Taylor v. Board of Education, 195 F.Supp. 231, 233 (S.D.N.Y.), aff'd, 294 F.2d 36 (2d Cir.), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961).

In Brown the Court emphasized "intangible considerations." The opportunity "to study, to engage in discussions and exchange views with other students" at the graduate level was found to "apply with added force to children in grade and high schools." Brown v. Board of Education, supra, 347 U.S. at 493–494, 74 S.Ct. at 691, 98 L.Ed. 873. It also adverted to the psychological effect of segregation with and without the sanction of law. It quoted with approval the finding of the lower court that: "Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is *greater* when it has the sanction of the law." (Emphasis added.) The Court made its own finding as to the psychological effect of that type of segregation before it in Brown:

> "To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." 347 U.S. at 494, 74 S.Ct. at 691.

In the instant case, plaintiffs' experts equate the psychological effect of de facto segregation with that found in Brown with reference to de jure segregation. This opinion is shared by the Board of Regents of The University of the State of

New York in a statement issued at its meeting of January 27–28, 1960:

"Modern psychological knowledge indicates that schools enrolling students largely of homogeneous, ethnic origin, may damage the personality of minority group children. Such schools decrease their motivation and thus impair the ability to learn. Public education in such a setting is socially unrealistic, blocks the attainment of the goals of democratic education and is wasteful of manpower and talent, whether this situation occurs by law or by fact."

We are dealing with children in grades K through 6, i. e., from age 5 to 11. They see themselves living in an almost entirely Negro area and attending a school of similar character. If they emerge beyond the confines of the Valley area into the District at large, they enter a different world inhabited only by white people. They are not so mature and sophisticated as to distinguish between the total separation of all Negroes pursuant to a mandatory or permissive State statute based on race and the almost identical situation prevailing in their school district. The Valley situation generates the same feeling of inferiority as to their status in the community as was found by the Supreme Court in Brown to flow from substantially similar segregation by operation of State law. This harmful effect, like pain and suffering in a tort action, is not susceptible of precise measurement. Nor is it known exactly when and how this psychological damage is manifested. The court cannot accept the opinion of Dr. Brickell, no psychologist, that psychological damage, if any exists, must necessarily be reflected in a lower level of achievement in the 3 R's than is normally expected on the basis of measured intelligence or socioeconomic level.

Despite all of the publicity attending the decision in Brown and the speculation as to its implications; despite the extreme situation which has prevailed in its District; despite the "intense interest of the staff and the growing interest of a certain group of the Valley area residents"; despite the defendant Collins' proposed plan for eventual integration—there has never been any discussion at a Board meeting to ascertain whether the basic obligation of the defendants, to afford the Valley children the opportunity to obtain the best education possible, can be pursued by means less drastic than its traditional rigid neighborhood school policy. The repeated references to possible community preference and the statement that the Valley situation is a matter for community determination betray an unwillingness to face an educational problem as such. It is the Board, not the electors, who fix attendance policies. It is the Board, not the electors, who must determine when, if ever, those policies should be modified. That there are less drastic means for achieving the educational objective is demonstrated by Dr. Collins' recommendation to the Board as far back as 1957. This is not to suggest that his proposed alternative is the only alternative, but, rather, that there are alternatives, less drastic in their effect, to the continuance of the present rigid policy. Shelton v. Tucker, supra. The defendant District is not comparable to the Pontiac School District; this case is not comparable to Henry v. Godsell, supra, in which Judge Levin found that a relaxation of the neighborhood school policy would result in "utter chaos." Nor are there present here the complicated problems present in Gary, Indiana, with a public school population of over 43,000 of which 53.5% are Negroes, or in large metropolitan areas—New York City for example. There are, no doubt, situations in which no alternative may be feasible. No such insurmountable obstacle appears to be present here.

■ The court is aware of the pendency of numerous suits throughout the Nation involving race relations and public education in which the facts may differ materially from those in the instant case. It is advisable, therefore, to state precisely what today's opinion has

and has not decided. The court does not hold that the neighborhood school policy per se is unconstitutional; it does hold that this policy is not immutable. It does not hold that racial imbalance and segregation are synonymous or that racial imbalance, not tantamount to segregation, is violative of the Constitution. It does hold that, by maintaining and perpetuating a segregated school system, the defendant Board has transgressed the prohibitions of the Equal Protection Clause of the Fourteenth Amendment. The court does not hold that the Constitution requires a compulsory distribution of school children on the basis of race in order to achieve a proportional representation of white and Negro children in each elementary school within a school district. There is no authority to support this claim of the plaintiffs. There is not presented here the question as to whether or not such compulsive distribution, though not required, may be permitted under the Constitution or by state law. See Bell v. School City of Gary, Indiana, supra, 213 F.Supp. at 831; In the Matter of Vetere, supra.

This decision makes unnecessary a determination as to whether the segregation found to exist is violative of other clauses of the Fourteenth Amendment or of the Civil Rights Act.

The defendant School Board is hereby directed to present to this court, on or before April 6, 1964, a plan to desegregate the elementary school system of the defendant District, in accordance with this opinion, to begin no later than the opening of the 1964–1965 Fall Term. The court hereby retains jurisdiction of this action until such a plan has been presented, approved by the court and implemented.

The foregoing opinion constitutes the findings of fact, conclusions of law and order of the court.

## Appendix

### Parental Occupations

In 1957, the New York State Education Department collected data from 100 public school districts of the State in connection with a study it had undertaken, the Quality Measurement Project. The defendant District being one of those schools, the Department of Education requested and received in June 1957 data as to the father occupation of children attending grades 3 and 6 of each of its three elementary schools. There were then 20 such children in the Valley School; 158 in the Plandome Road School and 170 in the Munsey Park School. The occupation classifications are significant. Divided broadly into (1) the professional and white collar group and (2) the other group composed of semiskilled, farm laborers, other laborers, servant class and those of unknown occupations, the data showed:

|  | Valley | Plandome Road | Munsey Park |
|---|---|---|---|
| White collar group | 4 or 20% | 145 or 92% | 156 or 92% |
| Other group | 16 or 80% | 13 or 8% | 14 or 8% |

A breakdown of occupations within these two groups showed a higher percentage of professional persons (27%), proprietors, managers and company officials (40%) in the Munsey Park area than in the Plandome Road area; more clerks and kindred workers (26%) and skilled workers and foremen (11%) in the Plandome Road area than in the Munsey Park area; more semiskilled workers (35%), laborers (10%), servants (35%) in the Valley area than in either of the other two areas.

In June 1963, the District distributed a questionnaire to each student in the three elementary schools soliciting in-

formation as to the occupation of his father. The number of responses was high:

| | | |
|---|---|---|
| Valley | 141 out of a total of 166 | |
| Plandome Road | 588 " " " " " 600 | |
| Munsey Park | 552 " " " " " 574 | |

Although several children did not know their fathers' occupations, the occupational data is significant:

| | Munsey Park | Plandome Road | Valley |
|---|---|---|---|
| Professional | 26.89% | 32.07% | .71% |
| Owner-executive | 42.24% | 28.01% | 2.84% |
| Misc. "white collar" | 28.34% | 25.37% | 9.94% |
| Skilled, semiskilled | .36% | 4.76% | 13.49% |
| Unskilled | — | 2.72% | 39.00% |

Of these parents in the Valley area, not one is a lawyer, doctor, dentist, educator, architect, engineer, accountant or consultant. In the other two areas, parents of elementary school children attending public school who are members of the professions are as follows:

| | Munsey Park | Plandome Road | | Munsey Park | Plandome Road |
|---|---|---|---|---|---|
| Lawyers | 29 | 43 | Architects | 2 | 3 |
| Doctors | 41 | 31 | Engineers | 19 | 38 |
| Dentists | 13 | 7 | Accountants | 13 | 9 |
| Educators | 8 | 18 | Consultants | 5 | 1 |

A comparison of "white collar" occupations of parents whose children attend the three public elementary schools shows:

| | Munsey Park | Plandome Road | Valley |
|---|---|---|---|
| Owner-partner | 52 or 9.59% | 33 or 5.61% | 2 or 1.42% |
| Named executive | 181 or 32.65% | 134 or 22.40% | 2 or 1.42% |
| Editor-publisher | 7 or 1.27% | 5 or .85% | —— |
| Import-export | 8 or 1.45% | 7 or 1.19% | —— |
| Manufacturing | 22 or 3.99% | 7 or 1.19% | —— |
| Banking | 18 or 3.21% | 8 or 1.36% | —— |
| Real estate | 5 or .91% | 4 or .68% | —— |
| Investments | 9 or 1.63% | 10 or 1.70% | —— |
| Insurance | 11 or 1.9% | 5 or .85% | —— |
| Pilot | 7 or 1.27% | 5 or .85% | —— |
| Contractor-builder | —— | 9 or 1.53% | —— |
| Misc. "white collar" | 45 or 8.10% | 19 or 3.33% | —— |